Baltazar RIVAS, Appellant,

v.

UNITED STATES, Appellee.

No. 97–CF–304.

District of Columbia Court of Appeals.

Argued En Banc June 6, 2000.
Decided Aug. 23, 2001.

Jaclyn S. Frankfurt, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Mary Patrice Brown, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, M. Jeffrey Beatrice, and Elizabeth H. Carroll, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and TERRY, STEADMAN, SCHWELB, FARRELL, RUIZ, REID, GLICKMAN and WASHINGTON, Associate Judges.

### ON REHEARING EN BANC

GLICKMAN, Associate Judge.

Applying principles of constructive possession, a jury convicted appellant Baltazar Rivas and his codefendant Jose Melgar of possessing, with intent to distribute, cocaine found in plastic bags that lay between them in the console of a car in which Melgar was the driver and Rivas the front seat passenger. A division of this court affirmed both convictions in *Rivas v. United States*, 734 A.2d 655 (D.C.1999) (*Rivas I*). We granted Rivas's petition for rehearing en banc in order to reconsider a rule followed in *Rivas I* and other recent cases that appears to ease the government's burden of proving constructive possession when drugs are found in the "close confines" of an automobile, as distinct

from, say, a dwelling. The division relied upon this special "automobile" rule in rejecting Rivas's challenge to the sufficiency of the evidence that he intended to exercise dominion or control over the cocaine in Melgar's car, stating that "our decisions . . . leave no doubt that the requisite intent may be inferred from the presence of contraband in an automobile, in plain view, conveniently accessible to the defendant." *Id.* at 657 (internal quotation marks and citations omitted).

■ We agree with Rivas that no categorical distinction based on where drugs are found—and certainly no lessening of the government's burden of proving constructive possession on that basis—is justified. A defendant's close proximity to drugs in plain view is certainly probative in determining not only whether he knew of the drugs and had the ability to exert control over them, but also whether he had the necessary intent to control (individually or with others) their use or destiny. Nevertheless, we make clear today that there is no "automobile" exception to the settled general rule that knowledge and proximity alone are insufficient to prove constructive possession of drugs beyond a reasonable doubt. A passenger in someone else's car, who is not the driver and who does not have exclusive control over the vehicle or its contents, may not be convicted *solely* on the basis that drugs were in plain view and conveniently accessible in the passenger compartment. As in all other constructive possession cases, there must be something more in the totality of the circumstances—a word or deed, a relationship or other probative factor—that, considered in conjunction with the evidence of proximity and knowledge, proves beyond a reasonable doubt that the passenger *intended* to exercise dominion or control over the drugs, and was not a mere bystander.

Applying this standard to the government's proof in this case, we also agree with Rivas that the evidence was insufficient to sustain his conviction. As the division itself intimated, the necessary "something more in the totality of the circumstances" beyond proof of proximity and knowledge was missing. Rivas was observed sitting in Melgar's car for only a few moments; "there was no evidence as to how long Rivas had been in the vehicle," *Rivas I*, 734 A.2d at 657, and there was no other substantial evidence against him. A reasonable trier of fact could not be certain beyond a reasonable doubt that Rivas intended to exert control over those drugs, i.e., that he was not just an innocent bystander. We therefore must reverse Rivas's conviction.

## I.

Viewed in the light most favorable to the government,[1] the evidence showed that two police officers in uniform, in a marked police cruiser, were patrolling on Hyatt Place, N.W., at around 1:00 a.m. when they saw an automobile stopped in the middle of the street. The officers pulled up behind the car, a two-door Honda occupied by the driver (Melgar, who was also the registered owner of the vehicle), a front seat passenger (Rivas), and two rear seat passengers. Seconds later the passenger-side door opened and Rivas stepped out; leaving the door open, he walked to the sidewalk where he engaged another man in conversation. Soon afterwards the Honda pulled over to the curb. The police officers activated their overhead emergency lights and moved in behind the parked car. As they did so, Rivas, who evidently saw the officers approach, left the man he was

1. *See Curry v. United States*, 520 A.2d 255, 263 (D.C.1987).

speaking with and walked a short distance around the corner onto Park Road. There he remained to talk with someone else, out of sight of the police until he was apprehended a few minutes later.

In the meantime, as the officers approached the car on foot, Officer Mitchell looked in on the passenger side and saw an open container of alcohol on the rear floorboard. The occupants were ordered out of the car, and as Mitchell reached in to retrieve the container, he saw two plastic bags containing a visible white rock substance in the console between the two front seats. Mitchell, who could see the bags because a streetlight illuminated the interior of the car, told his partner to secure the other occupants while he went looking for Rivas. He found him in the midst of conversation some twenty to thirty feet from the corner of Hyatt Place and Park Road.

The plastic bags taken from the console of the car were later determined to contain twelve and six rocks of crack cocaine, respectively, weighing in the aggregate 1,951 milligrams. This was enough, according to a police expert, to furnish 195 separate "hits" or uses of the cocaine. The expert opined, hypothetically, that if the eighteen rocks weighed the same they would sell individually for about twenty dollars on the street; in other words, that the cocaine had a total street value of a few hundred dollars. In the expert's opinion, the amount and configuration of the drugs (in small rocks) were inconsistent with possession for personal consumption.

There was no evidence to show how long Rivas had been in Melgar's car when the police arrived on the scene, or what he or anyone else in the car had been doing. No evidence was presented that Rivas's fingerprints were found on the bags of cocaine seized from the car, or that Rivas had ever handled the bags or engaged in a drug transaction. No incriminating evidence was taken from Rivas's person,[2] and he said nothing to inculpate himself.

## II.

### A.

▮▮▮▮ To prove constructive possession, the prosecution was required to show that Rivas knew that the cocaine was present in the car and that he had both the ability and the intent to exercise dominion or control over it. *See, e.g., In re M.I.W.,* 667 A.2d 573, 575 (D.C.1995); *Bernard v. United States,* 575 A.2d 1191, 1195 (D.C. 1990).[3] Constructive possession may be sole or joint, *see Parker v. United States,* 601 A.2d 45, 51–52 (D.C.1991), and may be proven by direct or circumstantial evidence. *See Brown v. United States,* 546 A.2d 390, 397–98 (D.C.1988).

▮▮▮▮ No one disputes that the jury permissibly could find that Rivas *knew* the cocaine was in the console (given that it was in plain view), and that he had the *ability* to exercise dominion and control

---

**2.** Melgar had $236 in small denominations of bills on his person.

**3.** In *Bernard,* the first case in which this court fully and explicitly articulated the elements of constructive possession, we stated:

> To establish constructive possession it is not sufficient for the prosecution to show that appellants were within reach of the drugs; mere proximity to an illegal item is not enough. Rather, the government must establish that appellants knew of the location of the cocaine and that they exercised dominion and control over it. Specifically, the prosecution was required to prove that each appellant knowingly had both the power and the intention at a given time to exercise dominion or control over the cocaine.

> 575 A.2d at 1195 (internal citations omitted).

over it (given his proximity to it).[4] The question before us is whether the jury rationally could find beyond a reasonable doubt that Rivas *intended* to exercise that power, in other words that he in fact "had a substantial voice vis-a-vis the drug[s]." *United States v. Staten,* 189 U.S.App.D.C. 100, 106, 581 F.2d 878, 884 (1978). In general, the settled rule in constructive possession cases is that "[m]ere presence of the accused on the premises, or simply his proximity to the drug, does not itself enable ... a deduction" beyond a reasonable doubt that he had the requisite intent. *Id.,* 189 U.S.App.D.C. at 106, 581 F.2d at 884 (footnote omitted); *accord, Bernard,* 575 A.2d at 1195. "Nor is mere association with another, standing alone, enough even when the other is known to possess the drug." *Id.* (footnote omitted). Rather, there must be something more in the totality of the circumstances that—together with proximity and knowledge—establishes that the accused meant to exercise dominion or control over the narcotics:

> There must be some action, some word, or some conduct that links the individual to the narcotics and indicates that he had some stake in them, some power over them. There must be something to prove that the individual was not merely an incidental bystander. It may be foolish to stand by when others are acting illegally, or to associate with those who have committed a crime. Such conduct or association, however, *without more,* does not establish the offenses here charged.

*United States v. Pardo,* 204 U.S.App.D.C. 263, 277, 636 F.2d 535, 549 (1980) (emphasis in the original).

### B.

In recent years, decisions of this court have attempted to distill at least one principle from constructive possession cases, which, when compared to one another, can sometimes seem "a thicket of subjectivity." *United States v. Holland,* 144 U.S.App. D.C. 225, 227, 445 F.2d 701, 703 (1971) (Tamm, J., concurring). Recognizing the normal difference in size between a room in a house or other building and the interior of an automobile, our decisions have stated that "the requisite inferences [of dominion or control] may be drawn from the location of weapons [or other contraband] in plain view and substantially within a defendant's reach in the closer confines of an automobile." *In re T.M.,* 577 A.2d 1149, 1154 n. 12 (D.C.1990) (citing cases). In *In re F.T.J.,* 578 A.2d 1161, 1163 (D.C.1990), we declared that "our decisions ... leave no doubt that the requisite intent may be inferred from the presence of contraband in an automobile, in plain view, conveniently accessible to the defendant"—a declaration that the division echoed in *Rivas I,* as mentioned earlier. We have suggested that "[i]t is reasonable to expect the law to require a somewhat higher degree of proof [of intent] where an apartment visitor is alleged to have possessed contraband located somewhere within the large space of an apartment, as opposed to that required for an automobile occupant who knows a pistol [or other contraband] is within easy reach under or behind the seat." *Brown,* 546 A.2d at 395 n. 3.

Rivas criticizes these statements, contending that they amount to an unjustified relaxation of the proof requirements when persons are found near drugs in automo-

---

4. Nor is it disputed that, if Rivas constructively possessed the cocaine, he did so with the intent to distribute it. *See, e.g., Earle v. United States,* 612 A.2d 1258, 1270 (D.C.1992) (packaging of drugs "in ziplock bags, in amounts regularly sold and purchased on the street," sufficient to establish intent to distribute).

biles. Rivas observes that there is nothing "about the nature of a car, except its limited size, that would necessitate a different standard [of proof] in constructive possession cases." Limited size, however, is of questionable significance in this context. Rivas persuasively argues that physical proximity to drugs in the "close confines" of a car, at least one occupied jointly with other persons, may be *less* probative of possession than proximity in some larger enclosure because a passenger "is greatly restricted in her ability to distance herself from contraband in plain view. There is simply nowhere to go," especially when the car is in motion.[5] Moreover, Rivas points out, "the relationship of a 'visitor' in a car may be far more attenuated than a visitor to a house or apartment":

> People offer or accept rides from colleagues or acquaintances solely because they are travelling to a common destination. We might pick someone up in bad weather, merely recognizing them as a neighbor. We arrange car pools, and drive people home from parties knowing only that we have friends in common. In all these circumstances, we find ourselves in cars with people whom we might never have occasion to invite into the privacy of our own homes. There is no reason to conclude that a "visitor" in a car, as a general rule, has any greater relationship to its contents than a visitor to a home.

We agree with these reasons why any categorical distinction between cars and other enclosed places in deciding issues of constructive possession is untenable. Whether constructive possession has been proven beyond a reasonable doubt in

any given case depends, as the parties before us agree, on a fact-specific inquiry into all of the circumstances. A special exception for automobiles does not stand up to scrutiny. Thus, to the extent that language in our decisions may have implied from the normal size of a passenger compartment that proximity to exposed drugs in a car, without more, is sufficient to prove (beyond a reasonable doubt) the requisite intention to exercise dominion or control, we disavow that language.

### C.

Lest our holding be misconstrued, we do not mean to suggest that close proximity to exposed contraband—whether in a car or in a room—has no bearing on the issue of control. It plainly does. Nor do we mean to say that inferences of possession may not be drawn more readily from a person's presence in a car with contraband in plain sight, particularly if that presence is more than momentary, than in other circumstances. *See United States v. Tirrell*, 120 F.3d 670, 676 (7th Cir.1997) ("[I]n close quarters such as a car, a jury likely would have an easier time concluding that multiple individuals exercised control over a particular weapon."). To acknowledge no such distinction between a car and other surroundings would ignore the judgment and common experience embodied in statutes such as the one considered by the Supreme Court in *County Court of Ulster County, New York v. Allen*, 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).

In that case, three adult men and a 16-year-old girl ("Jane Doe") were charged with possessing two loaded handguns

**5.** As Judge Ruiz observed in her concurring opinion in *Rivas I,* automobile passengers
> are of necessity in close proximity to the belongings of others and have an opportunity to see them and have ready access to

them. . . . That knowledge and proximity, however, do not mean that we intend to exercise control over our neighbor's belongings . . .
734 A.2d at 663.

found in plain view in an open purse on the front floor or front seat of their car next to Doe after they were stopped for speeding on the New York Thruway. In accordance with a state statute, the jury was instructed that the presence of a firearm in an automobile is presumptive evidence of its illegal possession by all persons then occupying the vehicle. *Ulster County*, 442 U.S. at 142, 99 S.Ct. 2213.[6] The three male defendants challenged that statutory presumption on due process grounds, claiming that the evidence supporting its application to them failed to prove beyond a reasonable doubt that they possessed the guns. *See id.* at 147 & n. 5, 166, 99 S.Ct. 2213.

The Supreme Court held that the statute established only a permissible inference or presumption, not a mandatory one. This meant that proof of the "evidentiary" or "basic" facts could "constitute prima facie evidence" of "ultimate" or "elemental" facts, but that the inference was not binding on the jury. *Ulster County*, 442 U.S. at 156–57, 99 S.Ct. 2213. Such a permissive inference satisfies due process, the Court explained, as long as the ultimate or elemental facts are " 'more likely than not to flow from' [the basic facts]" and "the presumption is not the sole and sufficient basis for a finding of guilt." *Id.* at 165–66 & n. 28, 167, 99 S.Ct. 2213.

**6.** The Court noted that New York had an "analogous [statutory] automobile/narcotics presumption." *Ulster County*, 442 U.S. at 165 n. 27, 99 S.Ct. 2213.

**7.** The Court noted that the male defendants were not "hitchhikers or other casual passengers," that the guns were too large to be concealed in Jane Doe's handbag, and that the bag was open "and part of one of the guns was in plain view, within easy access of the driver of the car and even, perhaps, of the other two [male defendants] who were riding in the rear seat." Moreover, the Court reasoned, "[a]s a 16–year–old girl in the company of three adult men she was the least likely

Evaluating the application of the presumption on the facts before it, the Court observed that "[t]he argument against possession by any of the [male defendants] was predicated solely on the fact that the guns were [found] in Jane Doe's pocketbook." But the surrounding circumstances made it "highly improbable" that the handguns were in her sole possession, *id.* at 163, 99 S.Ct. 2213,[7] and assuming that the jury rejected that hypothesis,

> the case is tantamount to one in which the guns were lying on the floor or the seat of the car in the plain view of the three other occupants of the automobile. In such a case, it is surely rational to infer that each of the [defendants] was fully aware of the presence of the guns and had both the ability and the intent to exercise dominion and control over the weapons.

*Id.* at 164–65, 99 S.Ct. 2213. Moreover, concerning the analogous automobile/narcotics presumption in New York law, the Court quoted the drafters' statement that "[w]e do not believe that persons transporting quantities of contraband are likely to go driving about with innocent friends or that they are likely to pick up strangers." *Id.* at 165–66 n. 27, 99 S.Ct. 2213. "Legislative judgments such as this one,"

of the four to be carrying one, let alone two, heavy handguns":

> It is far more probable that she relied on the pocketknife found in her brassiere for any necessary self-protection. Under these circumstances, it was not unreasonable for her counsel to argue and for the jury to infer that when the car was halted for speeding, the other passengers in the car anticipated the risk of a search and attempted to conceal their weapons in a pocketbook in the front seat. The inference is surely more likely than the notion that these weapons were the sole property of the 16–year–old girl.

*Id.* at 163–64, 99 S.Ct. 2213.

the Court said, "deserve respect." *Id.* at 166 n. 27, 99 S.Ct. 2213.

As the Supreme Court made clear, New York's statutory presumption of possession from presence in a car with guns could not supplant the requirement of proof beyond a reasonable doubt. The presumption was available to the prosecution "as one not necessarily sufficient part of its proof." *Ulster County,* 442 U.S. at 166, 99 S.Ct. 2213. Thus, *Ulster County* does not support the proposition that a finding of guilt beyond a reasonable doubt may be based solely on evidence that contraband was found in an automobile in plain view, conveniently accessible to the passenger defendant. Nonetheless, as in the passages that we have quoted in the preceding paragraph of this opinion, the Court unquestionably affirmed the probativeness of such evidence on all of the elements of constructive possession. Indeed, the Court noted, as evincing a reasonable distinction, that while the jury convicted the defendants of possessing the guns exposed in the passenger compartment, it acquitted them of possessing a loaded machine gun and heroin located in the trunk of the car. *See id.* at 155 n. 14, 162 n. 23, 166 n. 29, 99 S.Ct. 2213. The principal factor that explained this difference in outcome was the defendants' proximity to exposed weapons in the passenger compartment, and the rational inferences of knowledge and ability and intent to exercise control which that proximity supported. *See id.* at 166 n. 29, 99 S.Ct. 2213.

We need only add that the reasonableness of such inferences holds true even when a legislature has not made them statutory. As Judge Schwelb put it in *Rivas I,* "[i]f a legislature may indulge such a presumption, ... it should not be unreasonable for an impartial jury to draw a similar inference." 734 A.2d at 658 n. 6.

**D.**

■ Acknowledging, then, the relevance of the evidence that Rivas was seen in close proximity to exposed drugs in the confined space of an automobile, we turn to the remaining issue. Was the evidence adduced in this case sufficient to prove possession by Rivas beyond a reasonable doubt? We hold that it was not.

Before discussing the sufficiency of that evidence, we think it useful to review the principles that must guide our evaluation; for this truly is a case that turns not on the absence of proof, but on the difference between the reasonable doubt standard and less stringent standards of proof.

■ The reasonable doubt standard of proof requires the factfinder "to reach a subjective state of near certitude of the guilt of the accused." *Jackson v. Virginia,* 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Proof of a fact beyond a reasonable doubt is thus "more powerful" than proof that the fact is "more likely true than not;" more powerful, even, than proof "that its truth is highly probable." *(Darius) Smith v. United States,* 709 A.2d 78, 82 (D.C.1998) (en banc) (approving formulation of reasonable doubt as "the kind of doubt that would cause a reasonable person, after careful and thoughtful reflection, to hesitate to act in the graver or more important matters in life"). This requirement, a component of due process, " 'plays a vital role in the American scheme of criminal procedure,' because it operates to give 'concrete substance' to the presumption of innocence, to ensure against unjust convictions, and to reduce the risk of factual error in a criminal proceeding." *Jackson,* 443 U.S. at 315, 99 S.Ct. 2781 (quoting *In re Winship,* 397 U.S. 358, 363, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)).

Proof beyond a reasonable doubt is not merely a guideline for the trier of fact; it also furnishes a standard for judicial review of the sufficiency of the evidence. *See Jackson,* 443 U.S. at 316–17, 99 S.Ct. 2781 (reasonable doubt standard is "more than simply a trial ritual"). Judicial review is deferential, giving "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* at 319, 99 S.Ct. 2781. A court must deem the proof of guilt sufficient if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (emphasis in the original). But this formulation does not mean that appellate review of sufficiency of the evidence is toothless. "We do not … fulfill our duty through rote incantation of these principles followed by summary affirmance." *United States v. Long,* 284 U.S.App.D.C. 405, 409, 905 F.2d 1572, 1576 (1990). We have an obligation to take seriously the requirement that the evidence in a criminal prosecution must be strong enough that a jury behaving rationally really could find it persuasive beyond a reasonable doubt.

This requirement means more than that there must be some relevant evidence in the record in support of each essential element of the charged offense. "The fact that evidence is relevant does not automatically make it sufficient to support a criminal conviction." Jon O. Newman, *Beyond "Reasonable Doubt",* 68 N.Y.U. L. REV. 979, 996 (1993). Slight evidence is not sufficient evidence; a "mere modicum" cannot "rationally sup-

port a conviction beyond a reasonable doubt." *Jackson,* 443 U.S. at 320, 99 S.Ct. 2781 (citation omitted). Moreover, while "[a] jury is entitled to draw a vast range of reasonable inferences from evidence, [it] may not base a verdict on mere speculation." *Long,* 284 U.S.App.D.C. at 409, 905 F.2d at 1576. "[T]he evidence is insufficient if, in order to convict, the jury is required to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation." *Curry v. United States,* 520 A.2d at 263.

In short, "if the evidence, when viewed in the light most favorable to the government, is such that a reasonable juror *must* have a reasonable doubt as to the existence of any of the essential elements of the crime," then the evidence is insufficient and we must say so. *Curry,* 520 A.2d at 263 (emphasis in the original) (citation omitted).

Turning now to the evidence in this case, it has the quality of a snapshot—a frozen instant in time and space, crystalized but devoid of explanatory context. The police discovered two bags of cocaine, worth a few hundred dollars on the street, lying exposed to view in the front console of Melgar's vehicle. Rivas had just been seen sitting for a few moments in the front passenger seat, in the company of Melgar himself and two other passengers. But there was no evidence as to how long Rivas had been in the car, how he had come to be there, or what he had been doing. There was no evidence that the occupants of the car were actively engaged in distributing drugs or preparing them for distribution when Rivas was present.[8] When the police arrived, Rivas made no gestures toward the drugs and did not

---

**8.** *Cf. Parker v. United States,* 601 A.2d 45, 52 (D.C.1991) ("[A]ppellants, in an inconspicuous older model car, pulled to a halt in an area notorious for heroin trafficking at the time when daily drug sales typically begin.").

signal in any other way an intent to hide or dispose of them. No other evidence was presented that linked Rivas to the cocaine.[9]

There is no serious doubt that at least one of the car's occupants was in possession of the drugs, and the jury could reasonably infer that Melgar, who was the owner and driver of the automobile and who was found with $236 in cash on his person, had control over its contents. But that does not mean that any of the other occupants shared possession of the cocaine with Melgar (indeed, the government did not charge the two rear seat passengers with possession), nor that Rivas in particular had a stake in it.

The government argues that the jury could find that Rivas jointly possessed the cocaine with Melgar in light of three factors. First and foremost, the government points to Rivas's proximity to drugs lying unconcealed next to him as one factor the jury could rely on to conclude that he possessed them. Second, the government argues that the jury could infer that Rivas was Melgar's ally in distributing drugs from his car from the fact that Melgar apparently entrusted Rivas with immediate access to the drugs. And third, the government argues that Rivas's actions after the police arrived suggested a person distancing himself from drugs in his possession; for having left the car door open, Rivas evidently intended to return to the car, but he changed his mind and took evasive action when the police signaled their intent to investigate.

Could a reasonable jury find that these factors add up to proof beyond a reasonable doubt that Rivas knowingly had the ability and the intention to exercise control over the cocaine? Knowledge of the cocaine, yes; ability, yes; but intention to exercise control over the cocaine, no—not beyond a reasonable doubt. A reasonable jury perhaps could find it *more likely than not* that Rivas jointly possessed the cocaine with Melgar. But that is where we think any reasonable jury would have to draw the line. In the record before us there is no *substantial* evidence of "some action, some word, or some conduct that links [Rivas] to the narcotics and indicates that he had some stake in them, some power over them." *Pardo,* 204 U.S.App. D.C. at 277, 636 F.2d at 549. If the standard of proof beyond a reasonable doubt means anything, the factors on which the government relies are not compelling enough to permit a reasonable jury to find Rivas guilty.

The first factor, Rivas's immediate proximity to unconcealed drugs in an automobile, certainly does make it more probable that he possessed the drugs. If the standard of proof were less rigorous, this evidence alone might have been enough to support Rivas's conviction. But the evidence that Rivas knowingly sat next to the cocaine in Jose Melgar's car did not by itself prove beyond a reasonable doubt that he "was not merely an incidental bystander." *Pardo,* 204 U.S.App.D.C. at 277, 636 F.2d at 549. Perhaps, for example, Rivas accepted a ride with Melgar not knowing there were drugs present until some time after he got in the car. Or Rivas may have been aware that Melgar had cocaine in his vehicle, but rode in the car anyway, intending to do nothing more than (foolishly) ride around with a friend who was also a drug dealer.[10] The critical

---

9. *Cf. Hamilton v. United States,* 395 A.2d 24, 28 (D.C.1978) (gun found in car jointly occupied by appellant had been seen in his possession previously).

10. As Judge Farrell ruefully observed in his concurrence in *Rivas I,* "[p]erhaps, especially in today's culture, the fact that a passenger has taken no steps to distance himself from

question is whether the other factors cited by the government add anything substantial to the mix, i.e., whether they reasonably combine with knowing presence to permit an inference of joint possession *beyond a reasonable doubt.*

The second factor on which the government relies is not about Rivas's state of mind; it is about Melgar's. The argument is that Melgar would not have been likely to let Rivas sit in the car next to the cocaine unless Rivas was part of his criminal operations. But whatever assumptions a jury might reasonably make about the usual operating procedures of drug dealers in general, and particularly those displaying large quantities of drugs, it is pure speculation that in this particular case Melgar—about whom we know nothing—was cautious rather than careless. Indeed, even if Melgar was cautious, he could have had many reasons to trust Rivas without Rivas having been part of his drug trafficking operation or having joint possession of his drugs. If knowing proximity to drugs is insufficient to prove guilt, being permitted to be in proximity adds virtually nothing unless the evidence also divulges *why* permission was granted. Melgar's unexplained willingness to let Rivas near his drugs in the circumstances of this case does not illuminate the intent of Rivas.

The government's third factor is Rivas's conduct after the police arrived: exiting the car when he (presumably) saw them drive up, leaving the door open behind him, and walking around the corner and out of sight when the officers approached the car on foot. We find these facts to be too equivocal to be informative on the central question of Rivas's intentions vis-a-vis the drugs. Rivas's behavior may have been evasive (though hardly stealthy or precipitous), but "[i]n our cases, we have looked for more than 'walking away' to find manifestation of a consciousness of guilt." *M.I.W.,* 667 A.2d at 577. We have appreciated that even "[l]eaving a scene hastily may be inspired by innocent fear, or by a legitimate desire to avoid contact with the police." *Id.* at 576 (quoting *Smith v. United States,* 558 A.2d 312, 316 (D.C.1989) (en banc)). "Headlong flight" may be "the consummate act of evasion: ... not necessarily indicative of wrongdoing, but ... certainly suggestive of such." *Illinois v. Wardlow,* 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). But Rivas did not engage in headlong flight or anything close. Assuming that the jury could conclude that Rivas did mean to distance himself while the police were around, that might reinforce the implication that he knew there was cocaine in the

---

drugs visibly meant for sale lying inches from him in a car driven by a friend says nothing, or too little, about whether he personally has 'some stake in [the drugs], some power over them.' " 734 A.2d at 659 (citation omitted). In this vein, Rivas complains that the government's position improperly "imposes on innocent citizens an affirmative obligation to distance themselves from contraband" that they are aware is at hand. The government counters that a jury *should* be able to draw guilty inferences from a person's failure to utilize readily available means of separating himself from marketable drugs, and that our cases have recognized as much. *See Brown,* 546 A.2d at 397 ("in full knowledge that [his code-fendant] was carrying the pistol, appellant knowingly and voluntarily continued his association with him"); *Parker,* 601 A.2d at 52 ("each [defendant] had control of whether to be present with the other at all"). We need not enter this debate in this case. Assuming that a passenger might remain in a vehicle containing contraband for so long a time and in such distinctive circumstances that his constructive possession of the contraband could be inferred, no such inference can be drawn in this case, given the total absence of evidence as to how long Rivas had been in Melgar's car and as to what he and the car had been doing before the police arrived.

car and did not want to be connected with it,[11] but it does not show also that he "had some stake in" the drugs himself. *Staten,* 189 U.S.App.D.C. at 106, 581 F.2d at 884. The additional fact that Rivas left the car door open, while perhaps suggesting that he planned to reenter the car and hence that he may have been more than a momentary or casual occupant, is marginally significant at best. If Rivas's guilt cannot be inferred from the fact that he was in Melgar's car for an unknown length of time, it cannot be inferred from the fact that he expected to continue to be in Melgar's car.

In short, an innocent person in Rivas's shoes might have acted exactly as he did when the police arrived. On the issue of whether he exercised control over the cocaine, Rivas's actions were insolubly ambiguous. *Cf. Speight v. United States,* 599 A.2d 794, 798 (D.C.1991).[12]

11. Although we indulge this interpretation of Rivas's behavior under our deferential standard of review, an alternative interpretation, also reasonable but favorable to Rivas rather than to the government, is that he left the car door open (knowingly exposing its interior to police inspection) and did not run away when he had the chance because he had no idea there were drugs in the vehicle.

12. In *Speight,* this court deemed the evidence of constructive possession insufficient even though the appellant, who was found with others in a private apartment standing a few feet away from drugs and drug paraphernalia in plain view, gave a false name in order to conceal his identity at the time of his arrest. While we fully appreciated that engaging in elusive behavior to avoid detection can "indicate" consciousness of guilt, we held that appellant's use of an alias, combined with his proximity to drugs in plain view, "falls short ... in establishing that appellant intended to exercise any dominion and control over the contraband in question or to guide its destiny." 599 A.2d at 796, 798. In words that might be applied almost verbatim to the present case, this court concluded:

> Based on what the government has presented, there are at least three plausible ex-

### III.

When the government proves the presence of contraband in an automobile, in plain view, conveniently accessible to a passenger defendant, the additional evidence necessary to prove constructive possession is comparatively minimal. As Rivas acknowledges in his brief,

> it could be a furtive gesture indicating an attempt to access, hide or dispose of the object, flight or other evidence of consciousness of guilt, evidence of participation in an ongoing criminal venture involving the contraband, an inculpatory statement, evidence of prior possession of the item, actual possession of paraphernalia relating to the use or sale of the contraband, control of the area or container in which the contraband is found, or the like.[13]

In this case, however, such additional probative evidence was lacking. The jury

planations for appellant's presence: (1) he was innocently visiting a neighbor who happened to be engaged in illegal drug trafficking; (2) he was present in order to purchase drugs; or, (3) he was actively involved in the drug trafficking. The jury could only speculate as to appellant's actual role. We conclude that no reasonable juror could find that appellant's role was as a participant in drug trafficking in light of other plausible reasons for his presence. *Id.* at 798.

13. Needless to say, Rivas's listing of additional evidence that would, together with proximity to contraband in plain view, support a conviction for constructive possession is not exhaustive. We think it appropriate to add, as has already been intimated, that a claim of innocent presence becomes decidedly less plausible in an environment (vehicular or otherwise) that is rife with evidence of ongoing drug production or distribution, such as a manufacturing or cutting facility, a warehouse, or a staging or preparation area where a large quantity of drugs or drug paraphernalia is exposed to view.

could only speculate about whether Rivas possessed the critical intent to exercise dominion or control over the cocaine in Melgar's car, or just happened to be present in the wrong place at the wrong time. The circumstances were suspicious, and perhaps Rivas is *probably* guilty; but on the thin record of this case, a reasonable doubt about his guilt ineluctably remains. The risk that an innocent man was convicted is therefore unacceptably large under our system of justice. Fidelity to the requirement of proof beyond a reasonable doubt in criminal cases requires that we reverse Rivas's conviction for insufficiency of the evidence.

*So ordered.*

RUIZ, Associate Judge, concurring.

This appeal raises the question of what evidence will suffice to prove the necessary element of intent under the doctrine of constructive possession. Specifically, we are concerned with whether proximity to contraband in plain view in an automobile is sufficient to sustain an inference of intent beyond a reasonable doubt, and, if not, what other facts are required to sustain such an inference. I join the majority's holding that knowing proximity to contraband, without more, is insufficient, whether in a car or elsewhere, to prove intent beyond a reasonable doubt. There must be additional evidence to show that the defendant had a stake in the contraband such that even if it was not in his actual possession, a jury could make an evidence-based finding beyond a reasonable doubt that the defendant intended to possess the contraband. I also join the majority's conclusion that the evidence in

this case was insufficient to prove that Rivas had such a connection with the drugs found in the car next to the seat in which he had been a passenger.

The doctrine of constructive possession is a judicially developed theory of liability designed to be a "proxy" for actual possession. *Burnette v. United States*, 600 A.2d 1082, 1084 (D.C.1991). As early as fifteen years ago we noted that our case law on "the question of who may be held responsible when the police find an illegal item in a location together with more than one individual demonstrates some inconsistency." *Wheeler v. United States*, 494 A.2d 170, 172 (D.C.1985). Cases decided since then have likewise failed to craft a coherent methodology in approaching this question. This case presents a good opportunity to review and clarify our constructive possession jurisprudence.

I write separately to explain how the decision we reach today fits in our jurisprudence on constructive possession, and why I think it correctly confines us to our judicial role, and away from policy-making in an area properly left to the legislature.

### I.

In order to obtain a conviction under a theory of constructive possession, the government must prove beyond a reasonable doubt that the appellant 1) knew of the location of the contraband, 2) had the ability to exercise dominion and control over the contraband, and 3) had the intent to exercise dominion and control over the contraband. *See, e.g., Bernard v. United States*, 575 A.2d 1191, 1195 (D.C.1990).[14]

14. Cases decided prior to *Bernard* defined the theory of constructive possession as based on two-part analysis, requiring proof only of knowledge and ability to exercise control over the contraband. *See Brown v. United States*, 546 A.2d 390, 394 (D.C.1988) (applying two-part analysis); *Tucker v. United States*, 421 A.2d 32, 35 (D.C.1980) (same); *Waterstaat v. United States*, 252 A.2d 507, 509 (D.C.1969) (same). Under this prior two-part formulation, we have affirmed convictions under a constructive possession theory on facts which

The purpose of the intent requirement is to protect against the possibility that bystanders may be unwittingly caught up criminally for mere innocent presence at the scene of illegal activity. "The issue of intention is quite as important as the issue of power. Someone might have effective power over drugs simply because they were located within reach ... but if such a person had power over the drugs ... but had no intention to exercise that power, there might still be no crime." *United States v. Zavala Maldonado*, 23 F.3d 4, 8 (1st Cir.1994). Accordingly, "there can be no conviction on the basis of constructive possession unless it is clear beyond a reasonable doubt that [appellant] intended to exercise dominion and control over [the contraband]." *In re M.I.W.*, 667 A.2d 573, 577 (D.C.1995). Even though we allow for the possibility of shared constructive possession, *see Roy v. United States*, 652 A.2d 1098, 1107 (D.C.1995), we have recognized that the need to accurately identify those who properly should be held criminally responsible for possession of contraband based on a theory of constructive possession is particularly acute in the inherently ambiguous situation where two or more persons are in proximity to, but not actually in possession of, contraband. *See Curry v. United States*, 520 A.2d 255, 264 (D.C. 1987). Thus, proof of intent to exercise dominion and control over contraband in such a situation "necessarily goes beyond mere knowledge by implying an intent—inferable from the circumstances—to assert dominion as against (hypothetical) competing claims to possession by others." *Burnette*, 600 A.2d at 1084.

As the majority notes, in this case we are not concerned with the question of the reasonableness of the inference of intent that may be derived from the proximity of a defendant to contraband in plain view, but rather with the sufficiency of the evidence necessary to prove such an inference beyond a reasonable doubt. Legislatures in a number of jurisdictions, but not in the District of Columbia, have enacted statutory provisions permitting an inference of possession to flow from the fact of the presence of drugs in a vehicle, whether or not in plain view.[15] Nevertheless, the

---

establish only proximity to contraband in plain view, because from proximity the jury could infer *convenient access* or *ability,* not *intent* to, control the contraband. *See Johnson v. United States*, 309 A.2d 497, 499 (D.C. 1973) ("evidence of proximity was enough to permit the jury to infer convenient access"); *see also Tucker*, 421 A.2d at 35 (weapon in plain view under armrest on seat next to where defendant had been seated); *Kenhan v. United States*, 263 A.2d 253, 254 (D.C.1970) (weapon found protruding from backrest and seat to the left of where appellant had been sitting); *Waterstaat*, 252 A.2d at 509 (conviction of driver upheld for possession of firearm found sitting on seat between driver and passenger despite passenger's testimony that it was his own pistol).

**15.** *See, e.g.,* Haw.Rev.Stat. Ann. § 712–1251 (Lexis through 2000 2d Special Sess.) (save certain limited exceptions, "the presence of a dangerous drug, harmful drug, or detrimental drug in a motor vehicle, other than a public omnibus, is prima facie evidence of knowing possession thereof by each and every person in the vehicle at the time the drug was found."); N.Y. Penal Law § 220.25(1) (Consol., Lexis through 2001 legislation) (controlled substance in automobile other than public omnibus is presumptive evidence of possession); Vt. Stat. Ann. tit. 18, § 4221(b) (LEXIS through 2000 legislation) (regulated drugs in automobile other than public omnibus is presumptive evidence of possession).

Similar statutory inferences have been applied in the context of firearms or other weapons found in automobiles. *See, e.g.* Ark.Code Ann. § 5–73–206 (Lexis through 2000 legislation) (machine gun in rooms, boats or vehicles); Conn. Gen.Stat. § 53–202(e) (Lexis through 2001 edition) (machine gun in rooms, boats or vehicles); 720 Ill. Comp. Stat. Ann. § 5/24–1 (d) (West, WESTLAW through 2000 Reg. Sess.) (weapons found in automobiles); Ind.Code Ann. § 35–47–5–4.1(b) (Lexis

courts in states with such presumptions have held that in evaluating sufficiency, the statutory inferences must be considered in the context of all the facts presented in each individual case; the existence of a permissible statutory inference does not mean that the evidence is sufficient to sustain a conviction in a particular case. *See, e.g., State v. Goyette,* 156 Vt. 591, 594 A.2d 432, 439 (1991) ("courts should evaluate the inference based on the record of the case before it"); *State v. Brighter,* 61 Haw. 99, 595 P.2d 1072, 1079 (1979) (in order for inference to be rational, government must prove that the quantity of drugs involved is greater than a quantity that would be possessed for personal use).

Similarly, in *County Court of Ulster County v. Allen,* 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979), the Supreme Court considered New York's statutory presumption that all individuals riding in an automobile are presumed to possess contraband found in the car, "as applied to the facts of [that] case." *Id.* at 163, 99 S.Ct. 2213. The Court specifically refused to decide the facial reasonableness of the presumption, *see id.* (concluding there was reversible error because federal appellate court passed on constitutionality of permissive inference on its face rather than as applied), but held instead that, based on the facts of the case taken as a whole, the evidence was sufficient to establish constructive possession. In *Ulster County,* police stopped a vehicle containing three adult males and a 16–year–old girl, finding two handguns protruding from the girl's handbag on the floorboard at her feet, where she was sitting in the front passenger seat. *See id.* at 143–44, 99 S.Ct. 2213. The Court found significant that the New York statute created only a permissive inference and noted that the trial court's "instructions plainly directed the jury to consider all the circumstances tending to support or contradict the inference that all four occupants of the car had possession of the two loaded handguns . . . ." *Id.* at 162, 99 S.Ct. 2213. The Court referenced numerous facts that suggested the girl was not the only individual in the car able to exercise dominion over the guns, there being "several circumstances" that made it "highly improbable." *Id.* at 163, 99 S.Ct. 2213. The Court then stated that

> [a]ssuming that the jury did reject [that the young woman solely possessed the weapons], the case is tantamount to one in which the guns were lying on the floor or the seat of the car in plain view of the three other occupants of the automobile. In such a case, it is surely rational to infer that each of the respondents was fully aware of the presence of the guns and had both the ability and the intent to exercise dominion and control over the weapons.

*Id.* at 164–65, 99 S.Ct. 2213. Although the government contends that this language is an implicit endorsement of the proposition that proximity and plain view alone may support a finding of intent beyond a reasonable doubt, the Court's decision is not based on plain view and accessibility alone, but on the "several circumstances" it expressly identified from the evidence presented in the case that bolstered the probative value of the permissive inference at issue in that case. *Id.* at 163–64, 99 S.Ct.

---

through 2000 Reg. Sess.) (sawed-off shotgun in motor vehicles); Md.Code Ann., Crimes and Punishments § 376 (1996 Repl.) (machine gun in room, boat or vehicle); Neb.Rev. Stat. Ann. § 28–1228 & § 28–1212 (Mitchie, Lexis through 2000 legislation) (explosive materials and firearms in other than public con-

veyances); N.Y. Penal Law § 265.15(4) (Consol., Lexis through 2001) (machine gun in vehicle, weapons in stolen vehicle, firearms in automobile); P.R. Laws Ann. Tit. 25, § 424 (1981) (weapons in vehicle); Va.Code Ann. § 18.2–292 (Mitchie 1996 Repl.) (machine gun in room, boat or vehicle).

2213.[16] This reading is consistent with the Court's emphasis that it was evaluating the reasonableness of the presumption as a permissive one, under the more lenient "more likely than not" test of *Leary v. United States*, 395 U.S. 6, 36, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), rather than as a mandatory presumption under the strict "beyond a reasonable doubt" test of *Barnes v. United States*, 412 U.S. 837, 842–43, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973). *See Ulster County*, 442 U.S. at 166, 99 S.Ct. 2213. The distinction is crucial because "[a]s long as it is clear that the presumption is not the sole and sufficient basis for a finding of guilt, it need only satisfy the test described in *Leary*." *Id.* at 167, 99 S.Ct. 2213. *Ulster County* thus, by its own terms, does not support the proposition that, standing alone, proximity and plain view are sufficient evidence for a finding of constructive possession beyond a reasonable doubt.

On the other hand, this court has had numerous opportunities to consider what evidence is necessary to sustain a conviction under a constructive possession theory. For example, recognizing that innocent presence or even guilty knowledge are insufficient to sustain a conviction for constructive possession, we regularly have stated that "[m]ere presence at the scene, association with one in possession, or proximity to the drugs do not in themselves substantiate a finding of constructive possession." *Hack v. United States*, 445 A.2d 634, 639 (D.C.1982).[17] We have noted the particular ambiguity of situations where more than one person is in the presence, but not in actual possession, of drugs, and that "any legitimate inference which can be drawn from such presence, proximity, or association is considerably weakened where the accused is one of several people gathered in the place where the contraband is found." *Curry*, 520 A.2d at 264. We have also demonstrated an unwillingness to impute possession of an illegal item to a visitor or even to "a resident of premises to which others have access ... without proof that the accused is actually involved in some criminal enterprise of which the contraband is a part." *Id.*[18]

Thus, for example, in *In re T.M.*, 577 A.2d 1149 (D.C.1990), we reversed the adjudications of delinquency for possession of a firearm and ammunition in a case in which the appellants were found in a bedroom "roughly equidistant from the contraband" when the police arrived. *Id.* at 1152. We noted that there was neither evidence that appellants "were more than comparatively short-term visitors" to the apartment, nor were they linked to an "ongoing criminal operation." *Id.* at 1153. Although the appellants' proximity to the

---

**16.** The Court noted that a 16–year–old girl in the company of three adult men was the "least likely of the four" to be carrying two heavy handguns in the handbag in which they appear to have been hastily placed; rather, it was "far more probable" that she would rely on the pocketknife found in her brassiere. *Ulster County*, 442 U.S. at 163–64, 99 S.Ct. 2213.

**17.** *See also Bernard*, 575 A.2d at 1195 ("mere proximity to an illegal item is not enough"; apartment); *Jefferson v. United States*, 558 A.2d 298, 303 (D.C.1989); *Curry*, 520 A.2d at 263 ("mere proximity to an illegal item does not of itself prove knowledge coupled with dominion or control"; apartment); *Wheeler*, 494 A.2d at 172 ("Mere proximity to an illegal substance will be insufficient to uphold a conviction on a theory of constructive possession when an individual is one of several people found by authorities together with the substance"; hotel room).

**18.** *See also Cook v. United States*, 272 A.2d 444, 447 (D.C.1971) (inference that visitor-appellant constructively possessed contraband "strained" when "tenant or lessee of the apartment was present at the time of the raid").

pistol and ammunition enabled the trial judge to conclude beyond a reasonable doubt that they knew of the contraband and had the power to exercise control over it, we held the government's proof to be insufficient as to their intent to exercise control over the contraband, holding that "[w]hen stripped to its essence, the case against these appellants consists of their proximity to a pistol and ammunition in plain view in a sordid crack house...." *Id.* at 1154.

Likewise, in *Speight v. United States,* 599 A.2d 794, 796 (D.C.1991), we held the government's evidence of intent to be insufficient because the government failed to prove anything more than proximity, noting "[i]t is not sufficient for the government to show that appellant was within reach of the drugs; mere proximity is not enough." In *Speight,* as police entered an apartment, a woman ran from her seat on the arm of the couch into the bathroom, and the appellant and another man were seen standing six feet from the couch. Drugs and drug paraphernalia were found on the couch where the woman had been sitting and on a table behind the couch. We reversed the conviction for insufficient evidence, because there was "no evidence other than [appellant's] presence indicating he was involved in a conspiracy to engage in any drug trafficking activity." *Id.* at 797. Noting that the "clear import of the evidence presented was that appellant was nothing more than a visitor in someone else's home," we emphasized that "constructive possession of items found on the premises should not be imputed readily to a visitor." *Id.* That the appellant gave a false name to the police was found insufficient evidence of consciousness of guilt from which to infer his involvement in the drug activity and, thereby, of intent to possess the drugs. Because there were "at least three plausible explanations" for the appellant's presence (an innocent visitor, a visitor to purchase drugs, or an active participant in drug trafficking), we held that the jury could only speculate as to his actual role and thus the government had failed to meet its burden of proof beyond a reasonable doubt. *Id.* at 798.

Even though we continuously stressed that proximity to contraband in plain view in an apartment or house fails to support an inference of intent, our case law developed, without much explanation, to allow proximity to contraband in plain view to support an inference of intent when the contraband was "substantially within a defendant's reach in the closer confines of an automobile." *In re T.M.,* 577 A.2d at 1154.[19] *See also Brown,* 546 A.2d at 395 n. 3 ("a somewhat higher degree of proof" is required when "contraband [is] located somewhere within the large space of an apartment, as opposed to that required for an automobile occupant"). In *In re F.T.J.,* 578 A.2d at 1163, the court explicitly recognized that "our decisions ... leave no doubt that the requisite intent may be inferred from the presence of contraband in an automobile, in plain view, conveniently accessible to the defendant."

**19.** The opinion in *In re T.M.,* an apartment case, distinguished its facts from *Brown* and *Waterstaat* and similar cases by stating that *In re T.M.* was not a case in which "the requisite inferences may be drawn from the location of weapons in plain view and substantially within a defendant's reach in the closer confines of an automobile." 577 A.2d at 1154 n. 12. In *In re F.T.J.,* 578 A.2d 1161 (D.C.1990), the court attempted to reconcile cases, such as *Waterstaat,* decided under the court's prior two-part formulation of the elements of constructive possession, see *supra* note 2, with the greater focus on intent announced in *Bernard* and subsequent cases, stating that in *In re T.M.,* "[b]y 'requisite inferences' we meant not only access and knowledge but the intent to exercise dominion or control ...." 578 A.2d at 1162–63.

Having reconsidered the issue, we now abandon the standard announced in *In re F.T.J.* and hold today that there is no special rule for automobiles that allows a sufficient inference of intent to control or exercise dominion over contraband to be derived merely from the fact of presence and proximity to that contraband in plain view. We are right to do so. First, the *In re F.T.J.* formulation does not necessarily follow from our cases.[20] The great majority of our decisions affirming constructive possession convictions of contraband found in automobiles, even in the early cases which neither articulate nor consciously apply an intent requirement, rely on fac-

**20.** Numerous cases from other jurisdictions also lend persuasive support to our decision to require evidence in addition to knowledge and proximity, without distinguishing whether drugs are found in a car or other premises. *See State v. Bell,* 566 So.2d 959, 960 (La.1990) (reversing a conviction based on a theory of constructive possession because "[f]rom Bell's mere presence in the car close to the sealed package on the console between the two men, a rational fact finder could not have concluded that, even assuming he was aware of the contents, Bell exercised control and dominion over the package, or that he willfully and knowingly shared with [code defendant] the right to control it"); *Taylor v. State,* 346 Md. 452, 697 A.2d 462, 468 (1997) (reiterating that mere presence or association without more, is insufficient to establish constructive possession); *State v. Fox,* 709 P.2d 316, 319 (Utah 1985) (reversing conviction of person who lived on the premise where marijuana was found because "persons who might know of the whereabouts of illicit drugs and who might even have access to them, but who have no intent to obtain and use the drugs can not [sic] be convicted of possession of a controlled substance. Knowledge and ability to possess do not equal possession where there is no evidence of intent to make use of that knowledge and ability."); *see also State v. Booth,* 11 S.W.3d 887, 892 (Mo.Ct.App.2000) ("proximity to the contraband, alone, even as to a substance in plain sight, [does not] tend to prove ownership or possession as among several persons who share the premises," though "it is also true that superior access to contraband as among two or more people, is an incriminating fact" suggesting possession) (internal citations omitted); *Hishaw v. State,* 568 P.2d 643, 645 (Okla.Crim.App.1977) ("mere presence of the defendant in even such a confined area as an automobile interior in which illicit drugs are found does not, standing alone, constitutes sufficient proof of his possession"); *Copeland v. Texas,* 747 S.W.2d 14, 15 (Tex.Ct.App.1988) ("If the proof does not show that the accused was in exclusive control of the premises where the substance was found, the state must offer additional independent facts and circumstances that affirmatively link the accused to the contraband."). *But see Haygood v. State,* 34 Ark. App. 161, 807 S.W.2d 470, 474–75 (1991) (plain view sufficient to establish constructive possession); *People v. Alston,* 302 Ill.App.3d 207, 235 Ill.Dec. 853, 706 N.E.2d 113, 117 (1999) (affirming, over vigorous dissent, the appellant's conviction in a case where appellant and another individual were sitting in the back seat of an automobile and a pistol was found protruding from the crack in the back seat, within one foot of either back seat passenger); *State v. Bonnet,* 731 So.2d 368, 374 (La.Ct.App.1999) (after stating that "mere presence in an area where a firearm is found, or mere association with an individual found to be in possession of a firearm, does not necessarily establish possession," court affirmed the conviction, without addressing the intent requirement, because, being in plain view, "the gun was within the dominion and control of the defendant, who was previously sitting in the passenger seat of the car").

Several federal appellate courts also hold that knowledge and proximity are insufficient for a finding of constructive possession. *See, e.g., United States v. Clark,* 337 U.S.App.D.C. 278, 284, 184 F.3d 858, 864 (1999) (same; "[a]n occupant of a car therefore need merely signify control of a particular space in the car to give rise to an inference of constructive possession"); *United States v. Garth,* 188 F.3d 99, 105 (3d Cir.1999) (mere possession, proximity or association are insufficient); *Maldonado,* 23 F.3d at 8 ("Someone might have effective power over drugs simply because they were located within reach ... but if such a person had power over the drugs ... but had no intention to exercise that power, there might still be no crime."); *United States v. Pardo,* 204 U.S.App.D.C. 263, 277, 636 F.2d 535, 549 (1980) (requiring evidence of some affirmative act linking defendant to drugs).

tors in addition to proximity to contraband in plain view.[21] *See (Vincent) White v. United States,* 729 A.2d 330, 333 (D.C. 1999) (appellant-driver in control of vehicle; contraband found near accelerator pedal; furtive gestures inside car upon being stopped); *(Mischell) White v. United States,* 714 A.2d 115, 119 (D.C.1998) (gun found in box moments after appellant reached in same box); *Dickerson v. United States,* 650 A.2d 680, 683 (D.C.1994) (evidence of concert of illegal action among car's occupants; drugs found in medicine bottle bearing appellant's name); *Davis v. United States,* 564 A.2d 31, 45 (D.C.1989) (en banc) (evidence of appellant's prior possession of gun; involvement in shooting); *Wells v. United States,* 515 A.2d 1108, 1113 (D.C.1986) (drug paraphernalia found next to appellant on seat; gun partially visible directly under seat of appellant; evidence of ongoing criminal operation); *United States v. Covington,* 459 A.2d 1067, 1071 (D.C.1983) (appellant-driver attempted to flee police and twice braked during chase to allow passengers to exit and escape, evincing consciousness of guilt in addition to plain view of contraband); *Hamilton v. United States,* 395 A.2d 24, 26 & 28 (D.C.1978) (appellant in prior possession of gun; appellant sitting in passenger seat next to where the gun was found between the passenger seat and door, evincing control over the space); *Jones v. United States,* 299 A.2d 538, 538 (D.C.1973) (appellant made furtive gesture toward handgun partially concealed under towel between front seats of automobile); *Porter v. United States,* 282 A.2d 559, 559 (D.C.1971) (although gun found under right passenger seat, appellant-driver in control over vehicle; appellant or co-defendant seen carrying gun earlier).

Second, although proximity to drugs can be probative of intent to control the drugs, proximity is a relative concept that must be evaluated in the context of the totality of the circumstances in a particular case. As the majority notes, a categorical distinction between knowing proximity to drugs in a car, as opposed to a house or apartment, does not withstand scrutiny. The closer proximity to drugs (or any item) in an automobile, where a passenger's ability to remove him or herself from the presence of contraband is limited by the car's close space and mobility, may be less probative of intent than proximity in a house or an apartment, where an individual has greater freedom of movement and may therefore choose where to be in relation to the item in question. *See Rivas v. United States,* 734 A.2d 655, 663 (D.C. 1999) (Ruiz, J., concurring). Therefore, just as caution is in order before possession of an illegal item is imputed to a visitor in a house or apartment without some further proof, *see Braxton v. United States,* 669 A.2d 1306, 1312 (D.C.1995) ("If the contraband is seized from a residence which is occupied by more than one person, the government must also establish that the accused is more than a mere visitor to the premises ...."); *In re T.M.,* 577 A.2d at 1153 (constructive possession "should not be lightly imputed to one found in another's apartment or home"); *Curry,* 520 A.2d at 264; *Wheeler,* 494 A.2d at 173, at least a like caution should operate before imputing possession to one of several passengers in an automobile. *Cf. Ulster County,* 442 U.S. at 163, 99 S.Ct. 2213 (fact that appellants were not "hitchhikers or other casual passengers" supported inference of possession). Absent

---

**21.** Indeed, in *In re F.T.J.,* which announced the "automobile rule," the jury was presented with more evidence than merely the appellant's proximity to contraband in plain view;

the car contained three persons and three guns, supporting a reasonable inference that each occupant possessed a gun. *See In re M.I.W.,* 667 A.2d at 577 (explaining *F.T.J.*).

additional evidence that proximity is probative of intent in the totality of the circumstances of a defendant's situation, in the ambiguous situation involving more than one person with access to contraband, physical proximity alone is insufficient to establish the intent element of constructive possession beyond a reasonable doubt.[22] There is no distinction in the quantum of proof required to prove the element of intent under a theory of constructive possession whether the contraband be found in a house, apartment or automobile.[23]

Finally, an important consideration for me is that a less demanding standard has too great a potential to impose criminal liability on a person who simply fails to disassociate from, or has mere knowledge of, the presence of contraband. This would ignore the reality that there is a broad range of what may be considered tolerable exposure to criminal activity. *See Rivas*, 734 A.2d at 659 (Farrell, J., concurring) ("Perhaps, especially in today's culture, the fact that a passenger has taken no steps to distance himself from drugs visibly meant for sale lying inches from him in a car driven by a

friend says nothing, or too little, about whether he personally has some stake in the drugs.") (internal quotation and alteration omitted). Moreover, a person's living conditions, relatives and friends may not permit the luxury of safe distance from criminal behavior in a crowded, harsh and sometimes inescapable urban environment. If we permit too low an evidentiary threshold for constructive possession, we would in essence be setting a heightened standard of behavior, on pain of criminal sanction, for individuals faced with close proximity to contraband in plain view. If knowing proximity to contraband is to be a crime, it is for the legislature to declare it. What we must do is ensure that in setting the evidentiary minimum to establish the judge-made elements of constructive possession as a proxy for actual possession, the jury does not stray from the offense of drug *possession* that the legislature has criminalized, as possession is normally understood.[24]

## II.

So the question becomes, what is necessary to prove intent in a constructive pos-

---

**22.** In situations where there is only one person in possible constructive possession, the ambiguity is lessened, although not necessarily eliminated. It then also becomes relevant to know the period of time during which the person has been in "exclusive" proximity, and evidence that others may have been responsible for the contraband's presence may render the situation just as ambiguous as when more than one person is present.

**23.** I agree with the majority that the probative value of knowing presence in close proximity to contraband may increase with the length of that presence, whether in a car or dwelling, depending on the facts of the particular case. See *ante* at p. 131. Although I also agree that "there is no serious doubt that at least one of the car's occupants was in possession of the drugs," see *ante* at p. 135, in the sense that the drugs surely did not get to the car by themselves and must be attributable to some-

one, it remains the government's burden to show that such person was in the car, *e.g.*, by inferring as to the driver-owner control over the car and its contents. The same is true of contraband in a dwelling. The point is that the burden of proof is the same, and that location is one factor in the totality of the circumstances that needs to be taken into account.

**24.** The majority states it does not need to "enter the debate in this case" about whether criminal intent may be inferred from failure to separate from contraband. See *ante* at p. 135, note 10. My position is that it is not for the court—in this case or in any other—to decide whether a person's failure to distance himself or herself from contraband constitutes a criminal act. As the statute is currently worded in terms of "possession," it will not allow such an attenuated proof.

session case? The majority points to the formulation of the United States Court of Appeals for the District of Columbia:

there must be something more than mere presence at the scene of a criminal transaction. There must be some action, some word, or some conduct that links the individual to the narcotics and indicates that he had some stake in them, some power over them. There must be something to prove that the individual was not merely an incidental bystander.

*Pardo,* 204 U.S.App.D.C. at 277, 636 F.2d at 549. I agree that this standard is consistent with our cases and the function of the theory of construction possession as a proxy for actual possession.[25] This means that before a constructive possession case may be submitted to the jury, the government must be able to articulate some extra action, word or other conduct, supported by the evidence at trial, that links the defendant to contraband. As already discussed, our cases have recognized many such "plus factors:" evidence linking the accused to an ongoing criminal operation of which the possession is a part,[26] attempts to hide or destroy evidence,[27] other acts evincing consciousness of guilt such as flight,[28] and evidence of prior possession of the contraband.[29]

The majority opinion suggests that innocent presence becomes "decidedly less plausible in an environment that is rife with evidence of ongoing drug production or distribution ... where a large quantity of drugs or drug paraphernalia is exposed to view." See *ante* at p. 137, note 13. I agree that there may be cases in which the nature and/or quantity of the contraband may be such that the defendant's presence in close proximity provides an especially strong inference of criminal intent. Under such circumstances, a stranger to the criminal operation is not likely to be allowed to be present or a person would think to remove him or herself. *See, e.g., United States v. Soto,* 959 F.2d 1181, 1185 (2d Cir.1992) ("The jury could ... reasonably determine[ ] that only trusted members of the operation would be permitted entry into the apartment, because allowing outsiders to have access to an apartment with large quantities of narcotics in plain view could compromise the security of the operation."). *But see United States v. Jenkins,* 90 F.3d 814, 820–21 (3d Cir.1996) (proximity to fifty-five grams of cocaine, drug dealing paraphernalia and two loaded handguns on coffee table in front of where appellant, a visitor, was sitting in his underwear insufficient to establish dominion and control over contraband). For example, whereas there may be circumstances in which a person may not remove him or herself from the presence of a handgun in plain view, that person might be much more likely to do so if it were a machine gun, uzi or a whole cache of weapons. The same may be said of a very large amount of drugs or drug paraphernalia indicative of an active drug dealing operation. *See,*

---

**25.** Given the substantial identity between the statutes that make drug possession in the District of Columbia federal and District offenses, *compare* 21 U.S.C. § 841 (1994) *with* D.C.Code § 33–541 (1998 Repl.), the government should have the same burden of proof whether prosecuting the offense in the United States District Court for the District of Columbia or in the Superior Court of the District of Columbia.

**26.** *See Burnette,* 600 A.2d at 1084; *In re T.M.,* 577 A.2d at 1153; *Wheeler,* 494 A.2d at 173; *Covington,* 459 A.2d at 1071.

**27.** *See Wheeler,* 494 A.2d at 171; *Hack,* 445 A.2d at 637.

**28.** *See Covington,* 459 A.2d at 1071.

**29.** *See Davis,* 564 A.2d at 45; *Hack,* 445 A.2d at 637; *Hamilton,* 395 A.2d at 26.

*e.g., Parker v. United States*, 601 A.2d 45, 52 (D.C.1991). Mindful of entering "a thicket of subjectivity," *see United States v. Holland*, 144 U.S.App.D.C. 225, 227, 445 F.2d 701, 703 (1971) (Tamm, J., concurring), however, I would caution that the evidence should be such that it does not eviscerate the general rule that mere presence in proximity to contraband in plain view is an insufficient basis from which a jury may reasonably infer intent to control the contraband beyond a reasonable doubt. I read the majority's reference to "rife ... evidence of ongoing drug production or distribution" to mean, at a minimum, that the proper measure is not whether a person is in the presence of drugs sufficient to sustain a conviction for distribution (*i.e.,* enough to establish that the drugs were for sale). *See Brighter*, 595 P.2d at 1079 (permissive statutory inference sufficient if government proves "quantities of drugs which are clearly greater than quantities which would be possessed merely for personal use"). Although our cases have established that once possession is proved, relatively small amounts of drugs may be sufficient to further prove that the drugs are for sale, rather than for personal use, particularly where their packaging is suited for distribution, *see, e.g., Chambers v. United States*, 564 A.2d 26, 31 (D.C.1989) (three tinfoil packets of cocaine), an amount that may be probative of intent to distribute is not necessarily probative of intent to possess the drugs so as to establish constructive possession. In a case where the issue to be proved is intent to distribute, the defendant's link to the drugs has already been established and only the defendant's purpose in possessing the drugs remains to be shown. Expert testimony usually provides additional evidence from which the jury can properly infer intent to distribute the drugs based on their quantity and packaging. The threshold that must be crossed where the issue is intent to possess drugs is higher in order to link the defendant to the drugs in the first instance. There is no bright line to guide the trial court in its gate-keeping function, but it is important to recognize that there may be instances in which the nature or quantity of the contraband in plain view may support a particularly strong inference that a person's presence and proximity to the contraband is not innocent. The principal points are that the determination will need to be made on a case-by-case basis and that the jury must be carefully instructed that the relevance of such evidence is limited to intent to possess, and, as discussed above, does not allow the jury to convict based on whether it thinks a person acted wrongly or foolishly .in failing to disassociate from contraband.

### III.

I agree with the majority's analysis that the evidence in this case is insufficient to meet the demanding standard of guilt beyond a reasonable doubt because the jurors must have had a reasonable doubt about Rivas' guilt. *See (Darius) Smith v. United States*, 709 A.2d 78, 82 (D.C.1998) (en banc) (A reasonable doubt "is a doubt based upon reason—a doubt for which [there is] a reason based upon the evidence or lack of evidence in the case.") I add some comments about evidence and arguments not discussed by the majority, and to respond to the dissent.

### A. Rivas' Conduct

Officer Mitchell testified at trial that the officers observed a four-door Honda [30] stopped in the middle of the street and blocking traffic approximately three yards

---

**30.** The vehicle was registered to co-defendant Melgar.

from the corner of Park Road and Hyatt Place. Appellant Rivas was in the passenger seat, co-defendant Melgar was in the driver's seat, and two other men occupied the rear seats. The officers pulled their marked cruiser up to within four feet of the rear of the Honda, but did not honk the horn or otherwise make any effort to call attention to their presence or to get the stopped car to move. A "couple [of] seconds" later, Rivas exited the Honda from the right front passenger door and walked to the sidewalk on the right side of the street, leaving the door open. Rivas then began to converse with a man on the sidewalk, while Melgar and the two passengers in the rear remained in the stopped car. Within a couple of minutes of the cruiser's arrival, the Honda moved from the middle of the street to the curb, its right front door still open. At that point Rivas was still on the sidewalk, conversing.[31] The police followed the Honda to the curb, stopped two feet behind it, and then turned on their emergency lights, intending to effect a traffic stop. Rivas began to walk north on Hyatt Place until he reached the corner of Park Road, where he turned right (east). It was after the officers stopped the car and saw two zip lock bags on the brake console in the center of the front passenger compartment of the car that Officer Mitchell then set off on foot to apprehend Rivas. Officer Mitchell found Rivas talking with another person at the 1400 block of Park Road, approximately twenty to thirty feet from the corner of Hyatt Place and Park Road. About five minutes had elapsed from the time Rivas left the scene until Officer Mitchell found him on Park Road.

The dissent argues that the manner in which Rivas distanced himself from the car shows a guilty conscience, particularly because Rivas exited the car right after the police pulled up behind, while the car was still in the middle of the street. See *post* at p. 154. The evidence taken as a whole significantly weakens the inference the dissent would permit the jury to draw, that Rivas left the car because he was aware of the police presence. Co-defendant Melgar testified that he was out driving that night with three friends when his car "died out" in the middle of the street. After attending to the carburetor for one minute, Melgar was able to restart the car. With the car running again, Melgar was just about to drive on to Park Road when he noticed the police cruiser behind him with its emergency lights on. Upon seeing the police, he pulled his car over to the curb. The evidence was therefore undisputed from Officer Mitchell's and Melgar's testimony that the police did not turn on their lights and make their presence known until *after* Rivas had exited the car where it was stopped in the middle of the road. Although the jury could discount Melgar's testimony that the car had stalled and not draw the inference that the car's stalling prompted Rivas to exit the car where he did, there was scant evidence from which the jury could infer that Rivas left the car in the middle of the road in order to distance himself from the drugs once the presence of the police became known. To infer that Rivas exhibited a guilty conscience because he left the vehicle within a "couple of seconds" of the unannounced arrival of a police cruiser behind the car in which he was a passenger is too slim a reed to support an inference of intent beyond a reasonable doubt.

I would add to the majority's analysis that I consider particularly weak the argument that the jury could infer that Rivas was not just a passenger in the car, but that he indicated his connection to the car

---

**31.** Rivas' conversation with the man on the    sidewalk lasted between one and two minutes.

and its contents by his intent to return to the car after he stepped out, as evidenced by his leaving the passenger door open. According to this theory, when the police activated their emergency lights, Rivas realized the police "meant business" and altered his plan, deciding to exit the scene to avoid trouble, rather than return to the car,[32] and further, that Rivas did not run from the scene for fear of drawing attention to himself. From these inferences, the dissent contends, a reasonable jury could find that Rivas was guilty of possessing the drugs.

> We have observed that
>
> if words are not infrequently ambiguous, gestures are even more so. Many are wholly nonspecific, and can be assigned a meaning only in their context. Yet the observer may view that context quite otherwise from the actor: not only is his vantage point different, he may even have approached the scene with a preconceived notion—consciously or subconsciously—of what gestures he expected to see and what he expected them to mean. The potential for misunderstanding in such a situation is obvious.

*In re T.M.*, 577 A.2d at 1154 n. 10 (citing *People v. Superior Court*, 3 Cal.3d 807, 91 Cal.Rptr. 729, 478 P.2d 449, 455 (1970) (*en banc*)). In this case, the reason for Rivas' action of leaving the passenger door open when he exited the car is particularly opaque. Although the government argues that it evidences Rivas' intent to return, not only to the car, but to the drugs, it is equally possible that, although Rivas might well have intended to return to the car, he left momentarily not to avoid trouble with the police, but to seek help moving the car, which had stalled in the middle of the road. Further, to the extent that the government's argument is premised on the assumption that Rivas acted once he was aware of the police's presence, it would be anomalous for a person who knows he has drugs in the car to leave the door open, making it easier for police to spot the contraband, as happened here, where Officer Mitchell testified that he was able to see the drugs because of the light from street lamps, no doubt aided by the car's open door. An inference that Rivas intended to maintain dominion and control over the drugs from the fact that he left the passenger door open also requires speculation because it assumes a fact as to which there was no direct evidence, that the drugs were on the console before Rivas left the vehicle a full five minutes prior to their discovery—time during which any of the three other passengers in the car who by then had a better basis than Rivas to be aware of the police's presence might have tried to dispossess themselves of the drugs. *See Ulster County*, 442 U.S. at 163–64, 99 S.Ct. 2213.[33]

---

32. The strength of the inference that Rivas evinced guilty knowledge by leaving the scene after he realized that the police "meant business" is significantly undermined by the trial court's denial of the government's request for an instruction on flight on the ground that there was no evidentiary support for the notion that Rivas was aware of the police's presence. The government does not appeal the trial court's ruling regarding the instruction. Notwithstanding that evidence of the flashing police lights allowed the case to go to the jury for consideration of the government's argument that Rivas was aware of the police's presence, we cannot ignore that the trial court refused to give a flight instruction because of the lack of a factual basis—an important indicator that the trial judge, who heard the evidence, thought it was *de minimis*. *See Scott v. United States*, 412 A.2d 364, 371 (D.C. 1980) ("A flight instruction is improper unless the evidence reasonably supports the inference that there was flight . . . .").

33. Inferences may be drawn from circumstantial as well as direct evidence, and as the government notes, inferential thinking is no more than everyday logical thinking. The

As the majority notes, Rivas did not break into a run, nor is there any testimony that Rivas acted "erratically," or suspiciously, see *Smith,* 558 A.2d at 319, or even turned around to see what the police were doing. Indeed, there is no indication from the record that Rivas' actions were prompted by police presence he preferred to avoid; he was not "nervous" or "evasive," nor can it be said that he "refus[ed] to cooperate," *Illinois v. Wardlow,* 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), because when Rivas walked away the police had not spoken to him or ordered him to return to the vehicle. Rivas simply walked to the sidewalk to talk to an individual standing there, virtually concurrent with the arrival of the police. As the police turned on their emergency lights, Rivas walked a few yards to the corner of Hyatt Place, where he turned the corner onto Park Road. Again, there is no indication in the record that Rivas took those further actions because he noticed the police or their emergency lights. Indeed, the testimony of the police suggests that Rivas' conduct had not aroused any suspicion until *after* the drugs were found in the car, when the officer went looking for him and found him, apparently without any difficulty. *Cf. Wardlow,* 528 U.S. at 122, 120 S.Ct. 673 (officers "turned their car ...., watched [appellant] as he ran through the gangway and an alley, and eventually cornered him on the street"). That Rivas only managed to put twenty to thirty feet between himself and the corner of Hyatt Place and Park Road in the approximately five minutes after he stepped out of the car further seriously undermines the inference that he intended to put himself beyond reach of the police because he had a guilty conscience. Under the circumstances, the government's argument to the jury that Rivas first waited in hopes that the coast would clear, and only fled after he realized the police "meant business," required the jury to engage in impermissible speculation. *See Roy,* 652 A.2d at 1103 (evidence is insufficient if " 'in order to convict, the jury is required to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation' ") (quoting *Curry,* 520 A.2d at 263).

2. *"Closer" Proximity to Contraband*

The government argues that a person who is closer to contraband has a greater ability than others also present (even if not an exclusive ability) to control the contraband, and that because Rivas was in closer proximity to the drugs on the center console than any of the three other persons in the car, the inference of his intent to possess the drugs is less speculative, notwithstanding the inherent ambiguity of the situation. The argument is based on the testimony of Officer Mitchell that the drugs were in the well for the brake lever and that "the brake lever would be closer to the passenger's seat," due to the design of the automobile's console. According to the officer, the drugs were "an inch" closer to Rivas than to his co-defendant, Melgar, the driver of the vehicle.

Such a small difference in the proximity of one person to contraband does not make

caution against permitting too many "inferences upon inferences" is not a comment on the general validity of inferential thinking, but rather a reflection of the seriousness of the jury's task in a criminal case. In the realm of evaluating evidence to determine whether it is sufficient to prove guilt beyond a reasonable doubt, the jury is charged with applying a stricter standard than in everyday decision-making; the jury must act with "careful and thoughtful reflection" as "in the graver or more important matters in life." *(Darius) Smith,* 709 A.2d at 82. The issue is not whether the jury may engage in inferential thinking; it may. The issue is whether the evidence is probative enough to permit the jury to make a required inference beyond a reasonable doubt.

a dispositive legal difference when determining whether that person constructively possessed the contraband. *See Porter*, 282 A.2d at 561 ("not of controlling significance that the weapon was closer" to one passenger or other). Here, there was no evidence relating to proximity that tipped the balance in favor of a finding that Rivas had the requisite intent. To the contrary, when viewed in the context that Melgar, as the driver of the vehicle, was in operational control of the console, and that the drugs' slightly more proximate location to Rivas could well be only by mere happenstance of the console's design, the negligible difference between Rivas' and Melgar's proximity to the drugs loses whatever probative potential it might have had to reasonably support an inference that Rivas intended to exercise dominion and control over the drugs on the center console.[34] Based on the evidence it is at least equally plausible that the driver could have placed the drugs on the handbrake console.

In *Parker*, 601 A.2d at 52, we concluded that an inference of shared possession of the drugs, which were "virtually equidistant" between appellants on the front bench seat of an older-model car, was permissible because the drugs, "a commodity of considerable value, was not being hoarded by either of the appellants ... each control whether to be present with the other at all in the car and where to locate a valuable container of illicit drugs." *Id. Cf. In re T.M.*, 577 A.2d at 1152. (in case where six persons "roughly equidistant"

from an unlicensed .45 pistol, court held that, "[a]lthough, like the other occupants of the room, were sufficiently close to the pistol and ammunition to enable the judge to conclude beyond a reasonable doubt that they knew that these items were there, and that they had the power to exercise dominion over them, the proof here will take the government no further"); *Speight*, 599 A.2d at 796 (evidence insufficient to prove possession where appellants equidistant from drug paraphernalia and drugs in apartment). *Parker* recognized that "the proof must reflect both an ability and an intent to exercise dominion and control" over the contraband in question, 601 A.2d at 51 n. 19, and found the intent requirement satisfied by the additional proof of government expert evidence of an ongoing criminal operation. As discussed below, there was no such expert evidence in this case. Moreover, whereas the appellants in *Parker* were found seated in the automobile next to the contraband, as already noted, in the instant case the drugs were found several minutes after Rivas had exited the vehicle, during which time any of the three remaining occupants could have put the drugs on the brake console where they were discovered by the police. Our cases, therefore, do not support that the fact that Rivas was minimally "closer" to the drugs satisfies the intent requirement of constructive possession.

### 3. Expert Testimony

The government's expert testified that drug dealers "sometimes" work together

---

**34.** The present case is distinguishable from the line of automobile constructive possession cases cited by the government to support its argument because in each of those cases, the appellant apparently had the *greatest* amount of control over the illegal contraband, or over the area of the automobile within which the illegal contraband was found. *See Hamilton v. United States*, 395 A.2d 24 (D.C.1978) (upholding conviction of a passenger for carrying a pistol without a license where the pistol was found wedged between the front seat and the passenger's door); *Kenhan v. United States*, 263 A.2d 253 (D.C.1970) (upholding conviction for carrying a pistol without a license where the officer observed one to two inches of the butt of a pistol sticking out from between the backrest and seat to the left of where appellant, the passenger in the rear left of the car, had been sitting).

with other people; that they do not always personally carry the drugs they intend to sell or the money they make from distribution, but instead use a "stash or hiding place"; and that drug dealers working together "sometimes" have different responsibilities, "somebody might hold the narcotics, somebody might hold the money." The generalized expert testimony presented in this case can meet only part of the government's burden to prove intent to possess beyond a reasonable doubt; the government must prove also that Rivas was acting pursuant to such shared division of labor with Melgar.

Our prior cases have recognized, and we reaffirm today, that "presence, proximity or association may establish a prima facie case of ... possession when colored by evidence linking the accused to an ongoing criminal operation of which that possession is a part." *Davis*, 564 A.2d at 44 (internal quotation omitted). "The proof of such an ongoing criminal operation need not be explicit or strong," *Burnette*, 600 A.2d at 1084, but there must be evidence "linking the accused to [the] ongoing criminal operation." *Wheeler*, 494 A.2d at 173. We have cautioned, however, of the risk "that the patina of expert testimony will endow purely innocent activity with criminal attributes merely because that activity is 'consistent' with actions of criminals" *Parker*, 601 A.2d at 52.

The evidence presented in this case is readily distinguishable from that presented in *Carpenter v. United States*, 475 A.2d 369 (D.C.1984), in which an expert on drug transactions testified that "a common arrangement in drug transactions is for one man ... to have control of the drugs, and for another man ... to have control of the money, while one or more additional persons ("runners") act as go-betweens ...." *Id.* at 375. In addition to the expert testimony, evidence was presented that the appellant's movements "were fully consistent with the role of 'runner.'" *Id.* The appellant was observed approaching vehicles, receiving money, going to another party making "hand-to-hand contact," then to another from which he received "a small white object" that he in turn gave to the driver of the vehicle. *Id.* at 372. Likewise, in *Bullock v. United States*, 709 A.2d 87, 90 (D.C.1998), expert testimony that "explained how open-air drug enterprises tend to operate," was related to the case at hand by eyewitness testimony that the appellant "physically gave a bundle of cellophane packets" later found to contain heroin and "periodically emerged from [an] alley to check" on the distribution. In each of these cases, the expert testimony described the appellant's affirmative actions as part of an overall ongoing criminal enterprise consistent with expert testimony.

In *Parker*, evidence of an ongoing criminal operation was provided by expert testimony establishing that the facts of the case were consistent with the appellants being engaged in a drug distribution business. Although the evidence of appellants' actions in *Parker* vis-à-vis the contraband was less than in *Bullock* or *Carpenter*, there was more than in this case. In *Parker* the drugs were found in numerous "individually packaged bags of heroin," in a quantity "only drug dealers would possess," consistent with the expert's testimony. 601 A.2d at 52. Additionally, appellants arrived "in an inconspicuous older model car, pulled to a halt in an area notorious for heroin trafficking at a time when daily drug sales typically begin," which "precisely matched the method ... by which drug distribution 'lieutenants' deliver narcotics to 'holders,'" as detailed by the expert. *Id.* Responding to a forceful dissent that "what the government's factual witnesses were unable to show cannot be provided ... by an 'expert witness'

whose testimony was merely that the defendant's conduct was consistent with a drug distribution operation (a truism)," *id.* at 53 (Newman, J., dissenting), we emphasized in *Parker* that "[t]he expert testimony ..., in addition to making clear the distributive attribute to the quantity of heroin in the bag, gave important color and meaning to the observed facts but did not, alone, supply the basis for the convictions." *Id.* at 52. In this case, however, the expert testimony stands alone, finding no echo in Rivas' actions.

Apart from Rivas' presence in the car, there is no evidence in this case that links Rivas to an ongoing criminal operation of which possession of the rock cocaine is a part. Notably, in this case there was no evidence presented of the relationship between Rivas and the driver of the vehicle; nor was there evidence that the car was stopped in an area known for drug trafficking, that the car in which Rivas was a passenger had any of the characteristics of those driven by drug dealers as the expert testified in *Parker*, or that Rivas' movements were consistent with the roles described by the government expert, that "somebody might hold the narcotics, somebody might hold the money." Although Melgar was found with $236 on his person, suggesting that he could be the "money" man, the facts do not indicate that Rivas was "holding" the drugs; the drugs were neither in a "stash or hiding place" nor in Rivas' personal possession. Indeed, the facts are at least equally consistent, if not more consistent, with the possibility that Melgar, in whose car the drugs were found in a location under his control as driver, was in charge of both the money and the drugs.

*Parker* is distinguishable not only with respect to the evidence presented of an ongoing criminal operation, but in the quantity of drugs at issue in that case, a factor that, as previously stated, may be more probative of intent to exercise control over drugs in what may otherwise be too ambiguous a circumstance for significant probative value. *Parker* involved a "narcotics-laden bag, a commodity of considerable commercial value," 601 A.2d at 52, which contained "twenty-seven packets of heroin and two packets of cocaine." *Id.* at 50. The court considered the evidence sufficient to prove joint constructive possession relying on the fact that neither appellant was attempting to "hoard" such a valuable commodity. *Id.* at 52.[35] In this case, however, the amount and value of the drugs were much less: two packets containing 18 loose rocks of cocaine base weighing a total of 1.95 grams, that were valued at $360. Even though the quantity of the drugs recovered in this case would suffice to prove that the drugs were meant for distribution by *someone,* the evidence does not speak to Rivas' intention to possess the drugs in the first instance.

\* \* \*

In sum, the factors relied upon by the government, neither singly or in combination, permitted the jury reasonably to infer beyond a reasonable doubt that Rivas intended to possess the drugs found some five minutes after he exited the car where he had been a passenger. Although the jury is allowed leeway to weigh the evidence and make inferences, to be beyond a reasonable doubt, its findings must be based on the evidence or lack of evidence. In this case, the jury did not have suffi-

---

**35.** As noted in *Parker,* "if th[e] case involved only the possession of the two packets of cocaine alone in a bag, the expert evidence about the other conduct being consistent with a drug drop could not sustain a conviction for distribution nor, most likely, possession." 601 A.2d at 52 n. 24.

cient evidence from which it could, without engaging in impermissible speculation, dispel a reasonable doubt that Rivas may have been an innocent bystander to the drugs found on the brake console. This does not mean that the government must disprove every possible innocent explanation. It is clear that the government does not have that burden. *See Jackson v. Virginia*, 443 U.S. 307, 326, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Our focus here is on the evidence that was presented to the jury. A "careful, honest, and impartial consideration of all the evidence" in this case does not overcome a reasonable doubt that Rivas was innocent and thus could not have left the jury "firmly convinced" of Rivas' guilt beyond a reasonable doubt. *(Darius) Smith*, 709 A.2d at 82.

STEADMAN, Associate Judge, with whom WAGNER, Chief Judge, and TERRY, Associate Judge, join, concurring in part and dissenting in part.

I concur in parts I and II(A), (B), and (C) of the majority opinion. My disagreement is with the application of those principles to the specific facts of this case in order to determine the sufficiency issue.[1]

The task of ruling on constitutional sufficiency "does not require a court to ask itself whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (citations omitted). The emphases were placed by the Supreme Court in its original holding.

Applying that test, I am unable to conclude on the record here that *no* rational trier of fact could have found appellant guilty under the requisite standard. The majority opinion lays out the factual elements, and I note most particularly the actions of appellant in exiting the automobile and departing the scene in the presence of police. This behavior, in the context of the entire circumstances, admitted of a reasonable conclusion and inference that the actions were those of a person increasingly disassociating himself from drugs in his possession with the growing involvement of the police; that is, an initial act of distancing himself—but not too far—from the car followed by his abrupt departure from sight when he saw that the police were serious about investigating. Furthermore, the nature of the exit itself from the car bears note: the Honda was stopped in the middle of the street late at night, the police car pulled up behind it, and at that point, presumably having observed the police car, the appellant left the car still parked in the middle of the street, leaving the door open in a manner suggesting an intention to return and maintain ready access to the inside of that vehicle where the drugs were in plain view next to where he had been sitting,

As the Supreme Court reasserted in the above-cited case, in which it ultimately concluded that the evidence was constitutionally sufficient, the prosecutor is not under an affirmative duty to rule out every

---

1. This issue standing alone would hardly justify review by the en banc court. See D.C.App. R. 40(e) (rehearing en banc will not ordinarily be ordered except where necessary to maintain uniformity of decisions or where proceeding involves a question of exceptional importance). The en banc opinion having re-

solved the possible conflict in our prior decisions, I would have been quite willing to remand the case to the panel for application of the relevant principles to this specific case. However, since the en banc court has determined to deal with the appeal as a whole, I will do likewise.

hypothesis except that of guilt. "That theory the Court has rejected in the past." *Id.* at 329, 99 S.Ct. 2781. *See also Owens v. United States,* 688 A.2d 399, 406–08 (D.C.1996) (Schwelb, J., concurring).

No claim is made that the jury here was not fully and correctly instructed on the meaning of the concept of "proof beyond a reasonable doubt." While I do not doubt the duty of this court to strike down convictions that fail to meet the constitutional standard of proof, I cannot say that the twelve members of the jury who heard all the evidence first-hand acted irrationally in finding the appellant guilty beyond a reasonable doubt or that the trial court twice erred in coming to a like conclusion in denying the repeated motions for a judgment of acquittal.