**Mario M. ZANDERS, Appellant**

v.

**UNITED STATES, Appellee.**

**No. 11–CF–1246.**

District of Columbia Court of Appeals.

Submitted Nov. 1, 2012.

Decided Sept. 12, 2013.

---

Joanne Vasco, Hyattsville, MD, was on the brief for appellant.

Ronald C. Machen, Jr., United States Attorney, and Elizabeth Trosman, Chrisellen R. Kolb, Jodi Steiger Lazarus, and Christopher Macchiaroli, Assistant United States Attorneys, were on the brief for appellee.

Before GLICKMAN and THOMPSON, Associate Judges, and TERRY, Senior Judge.

TERRY, Senior Judge:

Appellant was convicted of possession of cocaine with intent to distribute it while armed, along with three firearm-related offenses. On appeal he contends (1) that the trial court erred in denying his motion to suppress evidence that was seized following a traffic stop, and (2) that the evidence was insufficient to support his convictions. Finding no error, we affirm.

I

On December 11, 2010, at around 5:30 p.m., Officers Aaron Casper and Devon Atcheson of the Metropolitan Police saw a white Oldsmobile with temporary tags make a left turn without signaling in the 1200 block of Anacostia Road, Southeast. The officers turned on their lights and siren and pursued the Oldsmobile, which pulled over to the side of the road about two blocks away. Officer Casper reported the traffic stop to his dispatcher and requested backup assistance.

The officers approached the car, with Casper on the driver's side and Atcheson on the passenger's side. Inside the Oldsmobile were four young men. Brandon Hebron was in the driver's seat; behind him was Eric Wade; a juvenile (D.M.) was in the front passenger seat; and in the right rear seat was appellant Zanders. Officer Casper asked the driver, Brandon Hebron, for his license, registration, and

proof of insurance. Hebron responded that he only had his driver's license number, which raised the officers' suspicions because, in their experience, individuals who do not possess a valid driver's license will memorize the driver's license number of someone who does. Hebron also stated that the car did not belong to him, that it was his girl friend's car, and that he could not provide any of the ownership information. Officer Casper noted that Hebron appeared nervous.

The officers returned to their car to check the driver's license number, which turned out to be valid. At this point, however, the officers did not know whether the driver's license number belonged to Hebron, nor did they know to whom the car was registered. Just then two backup officers, Filip Simic and Myo Kyaw, arrived on the scene. The four officers went back to the stopped Oldsmobile to ask if there were any guns or drugs in the car; they also asked if they could search it. The driver, Hebron, who still appeared nervous, told the officers they could not search the car because it belonged to "his girl," because her brother had been using it, and because Hebron did not know what the brother might have left in the car.

Acknowledging Hebron's refusal of consent to search, Officer Casper started to bargain with him, and eventually he gained Hebron's consent to search the four occupants of the car, but not the car itself. Casper testified that he asked the occupants to get out of the car for safety concerns, because at that moment the officers had yet to determine who owned the car and whether Hebron indeed possessed a valid driver's license. As the occupants stepped out of the car, Officer Kyaw, who was standing next to the right front door, saw the magazine of a gun protruding from under the front seat. He immediately made a motion to the other officers to

handcuff the driver and the three passengers. At the same time, as Zanders was stepping out of the car, Officer Atcheson saw him grab a black jacket that had been on the seat next to him and drop it on the floorboard where his feet had been. The officers then called their supervising sergeant. Once he arrived, the officers discovered a second gun on the floor of the car in the rear passenger compartment where Zanders had been sitting, covered by the black jacket. The officers also searched all of the occupants. From Zanders they recovered $3600 in cash, three clear bags containing a white rock-like substance, and one bag containing a large white rock-like substance weighing 8.3 ounces, which turned out to be cocaine.

## II

■ Appellant argues that the trial court committed error by failing to suppress all of the evidence recovered after the traffic stop. Our review of a trial court's ruling on a motion to suppress is narrow in scope, *Womack v. United States,* 673 A.2d 603, 607 (D.C.1996), limited to "ensur[ing] that the trial court had a substantial basis for concluding that no constitutional violation occurred." *Brown v. United States,* 590 A.2d 1008, 1020 (D.C. 1991) (citation omitted). Thus legal conclusions are reviewed *de novo,* but the trial court's factual findings are left alone unless they are clearly erroneous. *Limpuangthip v. United States,* 932 A.2d 1137, 1141 (D.C.2007).

■ Appellant concedes that as a passenger he has no standing to challenge the validity of the search of the car. *See Rakas v. Illinois,* 439 U.S. 128, 148–150, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Passengers do have standing, however, to challenge the validity of a stop. *Brendlin v. California,* 551 U.S. 249, 257–259, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007). Car

passengers are "seized" within the meaning of the Fourth Amendment at the moment the police effectuate a traffic stop. *Id.* at 262, 127 S.Ct. 2400. Since the Fourth Amendment prohibits only unreasonable searches and seizures, a lawful-and therefore reasonable-traffic stop begins when the vehicle is pulled over and remains a reasonable "temporary seizure" of the driver and passengers for the duration of the stop. *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009). Furthermore, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Id.*

During a lawful traffic stop, an officer may order the driver and passengers out of a car "as a precautionary measure, without reasonable suspicion that the person poses a safety risk." *Brendlin*, 551 U.S. at 258, 127 S.Ct. 2400 (citing *Maryland v. Wilson*, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997)). However, before an officer may pat down those passengers, the officer "must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Johnson*, 555 U.S. at 327, 129 S.Ct. 781. If the officer develops probable cause to arrest a passenger, he may conduct a search of that passenger incident to the arrest. *E.g., Holt v. United States*, 675 A.2d 474, 481 (D.C.1996). In addition, a police officer lawfully positioned outside a vehicle who sees a gun (or other contraband) in plain view inside that vehicle has probable cause to seize it, *(Larry) White v. United States*, 763 A.2d 715, 721–722 (D.C.2000), and to arrest the person previously in possession of the gun or contraband. *Umanzor v. United States*, 803 A.2d 983, 998–999 (D.C. 2002). Finally, once an officer has proba-

ble cause to arrest a suspect, that officer "may search the arrestee's person and the area within his immediate control." *Holt*, 675 A.2d at 481 (citation omitted).

Appellant does not challenge the legality of the initial basis for the stop, namely, the fact that the Oldsmobile had made an improper left turn. He contends, however, that after the officers checked out the driver's license number and found it to be valid, the traffic stop was complete, and the car and its occupants should have been free to go. Instead, Officer Casper asked permission to search the car and negotiated with Hebron to search the occupants instead. Appellant argues that, up to that point, Officer Atcheson had been watching the occupants for any hint of a safety risk, and that there had been no action by any of the occupants, including appellant, to "trigger reasonable suspicion that a crime had been committed."

Despite appellant's contention that the investigation was over at the time the officers returned to the car after checking out the driver's license number, the trial court held differently. The officers testified at the hearing on appellant's motion that when they returned to the car, they still had several unanswered questions—specifically, whether the license number belonged to Mr. Hebron and to whom the car was registered. The court found this testimony to be credible and ruled that it was reasonable under the circumstances for the officers, after checking the driver's license number, to have additional questions for the driver about the license and registration of the car. The additional questioning by the officers is supported by *Arizona v. Johnson*, in which the Supreme Court held that additional inquiries on matters unrelated to the basis for the traffic stop are permissible as long as those inquiries do not "measurably extend the duration of the stop." 555 U.S.

at 333, 129 S.Ct. 781. Thus we hold that, at the moment the officers began to ask additional questions of the driver, the Fourth Amendment had not been violated.

 Nor was the Fourth Amendment violated when the officer asked the driver and the passengers to get out of the car. At this point in the sequence of events, the officers had just returned to the car, and the driver, Hebron, still appeared nervous. When asked if the officers could search the car, Hebron responded that the car belonged to his girl friend, that her brother had recently driven it, and that he was not sure what either of them might have "put in" the car. During a traffic stop, an officer does not even need reasonable suspicion of criminal activity to ask the driver and passengers to step out of the car, as *Brendlin* and other Supreme Court cases make clear; the officer may order anyone out of a car "as a precautionary measure, without reasonable suspicion that the [person] poses a safety risk." *Brendlin,* 551 U.S. at 258, 127 S.Ct. 2400. In this case the officers did not violate the Fourth Amendment by asking the four occupants to get out of the car because the investigation was still ongoing.

 Once the occupants had alighted, Officer Kyaw, while standing next to the car, saw the ammunition clip of a gun protruding from under the front passenger seat. The officer properly seized that gun, which gave the police probable cause to arrest all of the occupants of the car. *Umanzor,* 803 A.2d at 998–999; *Thomas v. United States,* 553 A.2d 1206, 1208–1209 (D.C.1989) (holding that the discovery of a bag containing guns and a ski mask gave police officers probable cause to arrest the three occupants of the car and justified the search of the trunk). Once the officers had seized that gun, they also had probable cause to search the rest of the car for additional weapons. *Johnson v. United*

*States,* 7 A.3d 1030, 1033–1035 (D.C.2010). Thus the second weapon found on the floor in the back seat area was lawfully seized. Also, after being arrested, appellant was subject to a search incident to arrest. *Walker v. United States,* 318 A.2d 290, 291 (D.C.1974). The evidence found on him, including the drugs and cash, was therefore lawfully seized.

The trial court's denial of appellant's motion to suppress is supported by the evidence and by applicable Fourth Amendment case law. We find no error.

### III

 Appellant also argues that the government failed to present sufficient evidence that he constructively possessed the gun found on the floor in the rear passenger compartment of the Oldsmobile. Our standard of review for challenges to the sufficiency of the evidence is well established. "We review the evidence in the light most favorable to the government, 'giving full play to the right of the jury to determine the credibility, weigh the evidence, and draw justifiable inferences of fact,' and we draw no distinction between direct and circumstantial evidence." *Wright v. United States,* 926 A.2d 1151, 1152–1153 (D.C.2007) (quoting *Timberlake v. United States,* 758 A.2d 978, 980 (D.C. 2000)).

 To prove constructive possession of a firearm, the government must show that the accused knew of its presence and "had both the ability and intent to exercise dominion and control over it." *Rivas v. United States,* 783 A.2d 125, 129 (D.C.2001) (en banc). This court held in *Rivas* that "mere proximity to exposed contraband within an automobile did not establish the requisite intent without 'something more' in the way of evidence." *Smith v. United States,* 899 A.2d 119, 121 (D.C.2006) (citing *Rivas,* 783 A.2d at 130). We have described "something more" as:

some action, some word, or some conduct that links the individual to the [contraband] and indicates that he had some stake in [it], some power over [it]. There must be something to prove that the individual was not merely an incidental bystander. It may be foolish to stand by when others are acting illegally, or to associate with those who have committed a crime. Such conduct or association, however, *without more*, does not establish the offenses here charged.

*Smith*, 899 A.2d at 121–122 (citing *Rivas*, 783 A.2d at 130). The conduct that could link a defendant to a gun (or other contraband) may include "attempts to hide or destroy evidence." *Smith*, 899 A.2d at 122. Thus, for example, we have found constructive possession of a firearm when the defendant kept his knees against the door of the glove compartment to keep a gun from falling out, *Smith*, 899 A.2d at 123; when the defendant reached into a box that was later found to contain the firearm, *(Mischell) White v. United States*, 714 A.2d 115, 119 (D.C.1998); and when the defendant moved his hand toward a handgun and knocked a bag of chips to the floor to conceal the butt of the gun, *Williams v. United States*, 884 A.2d 587, 604 (D.C.2005).

■ Appellant correctly notes that this court has "reject[ed] any presumption that contraband in plain view in an automobile is sufficient by itself to show that a passenger intended to control it." *Rivas*, 783 A.2d

at 143 (Ruiz, J., concurring). As *Rivas* teaches, in addition to proximity, there must be "something more." Appellant's principal argument is that his dropping of the jacket does not constitute "something more."[1]

Appellant relies on *Hutchinson v. United States*, 944 A.2d 491 (D.C.2008), in which we reversed the conviction of a defendant found guilty of constructive possession of cocaine found in a car where his feet had been. In that case, the government argued that the defendant had put his feet on top of the cocaine to hide it from the police. We reversed, noting that the defendant's conduct, without more, did not establish beyond a reasonable doubt that he knew the cocaine was at his feet, and holding that the facts could not support an inference that he intended to exercise dominion or control over it. *Id.* at 493–494.

*Hutchinson* is plainly distinguishable from this case. In *Hutchinson* we declared that simply having one's feet over the contraband, hiding it from the police, was not sufficient to infer intent to control it because there was no "movement or gesture" in front of the police. *Id.* at 493. Furthermore, there was no other evidence linking the defendant to a common drug venture with the driver or other passengers. We held that as a matter of law, the government had failed to show the "something more" required to prove the defendant's intent to exercise dominion and control over the cocaine. *Id.* at 494.

1. Appellant also puts forward an "innocent" explanation for his behavior: that while he was getting out of the car, he saw the gun sticking out and dropped the jacket to shield his friend from a second gun possession charge. He asserts that the gun was not positioned in such a way that he, sitting in the back seat on the right side, would have been able to use it. In addition, he argues that there was insufficient evidence that he knew the gun was at his feet, pointing to the time of

day (dusk), and the similar coloring (gray) of the gun and the car's interior. Finally, he maintains that as a short-term guest in the car, he cannot be charged with knowing about the location of every object.

These arguments ask this court to construe the evidence in appellant's favor, rather than in the government's favor as we must. For that reason, we find all of them to be without merit.

The case at bar is quite different. Here, one officer saw appellant pick up and drop a jacket onto the floorboard, briefly concealing the gun. This affirmative act is much closer to the actions of the defendants in such cases as *Smith*, 899 A.2d at 123 (knees holding a gun in the glove compartment), *(Mischell) White*, 714 A.2d at 119 (reaching into a box that concealed a firearm), and *Williams*, 884 A.2d at 604 (knocking a bag of chips to the floor so as to conceal a gun), than the comparatively innocuous conduct of the defendant in *Hutchinson* whose motionless feet concealed the cocaine, which was already lying on the floor of the car. In addition, the government in this case presented expert testimony describing the link between drug dealers and firearms, and noting that drug dealers often carry guns because they have large quantities of drugs and cash in their possession and are easy targets for robberies. This is relevant because appellant was found with one large rock of crack cocaine, three small ziplock bags of crack cocaine, empty ziplock bags, a digital scale, and $3600 in cash on his person.

Viewing this evidence in the light most favorable to the government, as we must, we are satisfied that a reasonable jury could find that appellant knew of the gun's presence and had the ability and intent to exercise dominion and control over it. His act of dropping the jacket to the floor of the car so as to conceal the gun satisfied the "something more" requirement of *Rivas*. Thus we hold that the evidence was sufficient to prove constructive possession.

IV

The judgment of conviction is
*Affirmed.*