# District of Columbia
# Court of Appeals

No. 15-CF-724

DEANGELO JENKINS,

Appellant,

FILED

FEB - 2 2017

DISTRICT OF COLUMBIA
COURT OF APPEALS

v.

CF2-137-15

UNITED STATES,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE: GLICKMAN and BLACKBURNE-RIGSBY, *Associate Judges*; and PRYOR, *Senior Judge*.

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the trial court's denial of appellant's motion to suppress is reversed.

For the Court:

*Julio A. Castillo*

JULIO A. CASTILLO
Clerk of the Court

Dated: February 2, 2017.

Opinion by Senior Judge William C. Pryor.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CF-724

DEANGELO JENKINS, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED 2/2/17
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior
Court of the District of Columbia
(CF2-137-15)

(Hon. Neal E. Kravitz, Trial Judge)

(Argued October 26, 2016                    Decided February 2, 2017)

*Justin Murray*, Public Defender Service, with whom *Samia Fam* and *Mikel-Meredith Weidman*, Public Defender Service, were on the brief, for appellant.

*Bryan H. Han*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney, and *Elizabeth Trosman*, *John P. Mannarino*, and *Thomas N. Saunders*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and BLACKBURNE-RIGSBY, *Associate Judges*, and PRYOR, *Senior Judge*.

PRYOR, *Senior Judge*:  Following a stipulated trial, appellant was convicted of the unlawful possession of a firearm and related charges.[1]  On appeal, appellant contends that the police lacked reasonable, articulable suspicion to stop and frisk him, and that the trial court thus erred in denying his motion to suppress.  We agree and reverse.

**I.**

**A.**

On a winter afternoon in January 2015, between 3:00 and 4:00 p.m., the complaining witness entered one of eight buildings on Columbia Road, Northwest, Washington, comprising the Columbia Heights Village (CHV) apartment complex. The complex has 400 units.  As the complaining witness was entering the building, he saw two black males standing together.  One of the two persons followed him

_____

[1]  Specifically, appellant was convicted of one count of unlawful possession of a firearm by a felon, D.C. Code § 22-4503 (a)(1); one count of carrying a pistol without a license, D.C. Code § 22-4504 (a)(1); two counts of possession of an unregistered firearm, D.C. Code § 7-2502.01 (a); two counts of unlawful possession of ammunition, D.C. Code § 7-2506.01 (a); and one count of possession of a large-capacity ammunition-feeding device, D.C. Code § 7-2506.01 (b). Appellant had also been indicted for one count of possession of cocaine, D.C. Code § 48-904.01 (d), but the court dismissed the charge with the government's consent.

inside and, while brandishing a weapon, demanded money. The complainant pushed the gunman away and returned outside. As the complainant exited the building, he noticed the second man was still outside.

Officer Jeffrey Polanco of the Metropolitan Police Department (MPD) interviewed the complainant on the same date at about 10:00 p.m. According to Officer Polanco, the complaining witness described the person who brandished the weapon as a 21- to 22-year-old, 5'8" to 5'9" tall, dark-brown-complected black male of average build, with dreadlocks hairstyle, a dark ski mask, and dark clothes, who "could possibly go by the name of 'Donnell.'" The person outside the building had identical characteristics as to age, clothing, and also wore a ski mask, but was described as light complected, and no description was made of his build or hairstyle.

Special Police Officers (SPOs), stationed at the CHV complex, had cameras inside all of the buildings and at some "strategic locations on the property." Officer Polanco did not see any video surveillance footage, but meanwhile SPOs at the CHV complex were "huddle[d] around a computer desk," rewinding and watching footage of "where . . . it happened." At that time, SPO Walker arrived at the station to begin his midnight shift. His colleagues told him "that a robbery had

just happened, and [that] they were looking at the [video for a] description of the suspect." Notably, the attempted robbery was not captured on the video. Rather, SPO Walker — who himself did not see any of the video — testified only that his colleagues "saw the people coming out . . . after it happened."

SPO Mason, who had operated the computer while the officers reviewed video footage, told SPO Walker that they had viewed a black male with a black ski mask, blue jeans, black jacket, and a bicycle.[2] SPO Walker testified that he "assumed that [SPO Mason] got [the description] from either [the] individual who was robbed, or . . . the camera footage." He also believed that there was only one suspect; did not know the suspect's age; and did not testify to the suspect's height, build, complexion, or hairstyle. Moreover, SPO Walker only recalled that they had been looking for "a black male on a bicycle." But a subsequent conversation with SPO Mason and a review of appellant's arrest record refreshed SPO Walker's recollection of the description. SPO Walker did not speak to the MPD, and SPO Mason did not testify. The surveillance video was not reviewed or submitted into evidence at the suppression hearing.

_____

[2] The complaining witness's description of neither the person inside the building nor the one outside included a bicycle.

After hearing SPO Mason's description, some of the SPOs returned to the computer. Then SPO Walker received a call from off-duty SPO Barber from the previous shift, who reported that he had seen a person who matched the description while driving on the nearby 1400 block of Harvard Street, Northwest. SPOs LeCounte and Dixon, two SPOs from the midnight shift, along with SPOs Walker and Mason, walked to the location identified by SPO Barber but did not see anyone. The time was between midnight and 1:00 a.m., and a midnight curfew at the CHV complex was in force.

The SPOs began walking on the grounds of the CHV complex and were walking on Columbia Road between 13th and 14th Street back toward the station. Though it was dark, streetlights and lights on surrounding buildings illuminated this section of Columbia Road, located within a block of a 24-hour 7-Eleven as well as bus and Metro stops. Riding toward them, they saw a person, later identified as appellant, on a bicycle five to ten yards away — wearing a black jacket and blue jeans, and pulling up or down his face a black ski mask. SPO Mason said, "[T]hat looks like the individual right there," or "That looks like him," whereupon SPO Dixon said "Stop." Appellant on the bicycle, then in between the four SPOs walking in twos, was stopped by SPOs Walker and Dixon, placed against a fence, and frisked for weapons by SPO Dixon. When the SPOs

recovered two weapons with ammunition, the suspect stated "Okay. You got me. You got me." He was handcuffed, arrested, and taken to the SPO's station. A subsequent search of appellant also revealed a white substance. According to photographs taken at SPO's station, appellant wore a black jacket, white shirt, blue jeans, and had a ski mask next to him; he did not have dreadlocks, had tattoos on his neck and arms, and was "[s]ort of" "light-skinned." According to SPO Walker, wearing a ski mask, coat, and jeans in January, and riding a bicycle was not unusual in that part of the city. The MPD did not perform a show-up.

**B.**

After a grand jury indicted appellant on drug and weapons-related counts, appellant moved to suppress, contending that the tangible evidence was obtained pursuant to an unlawful stop. At the conclusion of the hearing on appellant's motion to suppress, the trial judge denied the motion, ruling that appellant was seized in a lawful *Terry* stop based on reasonable, articulable suspicion that he had been "involved" in the attempted armed robbery committed several hours earlier at the CHV complex. Specifically, the judge found the stop reasonable even though appellant did not match the complaining witness's description of his assailant (appellant did not have dreadlocks or a dark complexion) because SPO Mason

identified appellant as looking like a "black male wearing a black ski mask, a black jacket, blue jeans, with a bicycle" that he reportedly had seen in a "video of something related to this attempted armed robbery."

The next day, appellant agreed to a stipulated trial, and the court dismissed the possession of cocaine charge with the government's consent while finding appellant guilty of all remaining counts. This appeal followed.

**II.**

The circumstances of this case cause us to consider the application of the stop and frisk principle, which the Supreme Court articulated in *Terry v. Ohio*, 392 U.S. 1 (1968). There the Court noted "that in dealing with rapidly unfolding and often dangerous situations on city streets the police are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess." *Id.* at 9. Thus, as this court has recognized, "[u]nder the Fourth Amendment, a policeman whose observations lead him reasonably to suspect that a particular person has committed . . . a crime[] may detain that person briefly in

order to investigate the circumstances that provoke suspicion."[3] *Ramsey v. United States*, 73 A.3d 138, 144 (D.C. 2003) (quotation and citation omitted). If, during the stop, an officer "has reasonable, articulable suspicion that the person detained is armed and dangerous, [the] officer may also conduct a protective frisk for weapons." *Robinson v. United States*, 76 A.3d 329, 336 (D.C. 2013) (internal quotation marks and citation omitted). Conversely, if a stop is unjustified, then the frisk that follows is likewise unjustified. *See Terry*, *supra*, 392 U.S. at 32 ("[I]f the frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds . . . to make a forcible stop.").

To be sure, reasonable suspicion is a less demanding standard than probable cause, "and requires a showing considerably less than preponderance of the evidence." *Morgan v. United States*, 121 A.3d 1235, 1237 (D.C. 2015) (quotation and citation omitted). Courts consider the totality of the circumstances "through the eyes of a reasonable and cautious officer on the scene, guided by his experience and training." *Singleton v. United States*, 998 A.2d 295, 300 (D.C. 2010) (quotation and citation omitted). The government, however, "must be able to point

---

[3] Because the SPOs here had "powers akin to that [*sic*] of a regular police officer," the Fourth Amendment governs their conduct. *United States v. Lima*, 424 A.2d 113, 118 (D.C. 1986 (en banc); *see also Limpuangthip v. United States*, 932 A.2d 1137, 1143 (D.C. 2007).

to specific and articulable facts" sufficient to justify the intrusion. *In re T.L.L.*, 729 A.2d 334, 339-40 (D.C. 1999) (quotation marks and citation omitted).

Our review of the trial court's denial of a motion to suppress evidence "is narrow in scope, limited to ensuring that the trial court had a substantial basis for concluding that no constitutional violation occurred." *Zanders v. United States*, 75 A.3d 244, 247 (D.C. 2013) (internal citations, quotation marks, and alteration omitted). We review legal conclusions *de novo* but leave untouched factual findings so long as they are not clearly erroneous. *Id.* Thus, we only "disturb the trial judge's findings of fact [if] they lack evidentiary support in the record." *In re T.L.L.*, *supra*, 729 A.2d at 339 (citations omitted). But we view "the facts and all reasonable inferences therefrom . . . in favor of sustaining the trial court ruling." *Milline v. United States*, 856 A.2d 616, 618 (D.C. 2004) (internal quotation marks and citation omitted).

## III.

Although the trial court meticulously reviewed the total circumstances of the stop in this case, we come to a different conclusion. As a preliminary matter, we observe that the complaining witness's description of the second person waiting

outside the building could not have contributed to any reasonable suspicion calculus. Based on the discrepancies between complaining witness's description of the robber and the person standing outside, the SPOs were either searching for a man with light skin whom they had no reasonable suspicion to stop, or they were looking for someone with dreadlocks and dark skin, a description that did not match appellant. This mismatch aside, the person outside never talked to, pointed a weapon at, or otherwise took action against the complainant. Merely seeing "both males together" falls short of justifying a *Terry* stop because guilt by association is not enough. *Smith v. United States*, 558 A.2d 312, 315 (D.C. 1989) ("The courts in the District of Columbia have . . . rejected articulable suspicion arguments based upon guilt by association"). The same applies to the complainant's apparent hunch that the person outside could have been a "possible lookout" for the suspect inside. *See Jackson v. United States*, 805 A.2d 979, 990 (D.C. 2002) (rejecting "the notion that the defendant's association with a known criminal will provide articulable suspicion").

In this instance it appears that the complaining witness gave the description of the attempted robber, as stated, to the MPD officer. SPO Walker received and made assumptions about the collective descriptions (of the robber), which he had heard. He was forthright that he did not possess first-hand knowledge of such.

SPO Mason, who had manned the video equipment, and was present when appellant was observed on the street, did not testify at the hearing. This leaves us with considerable uncertainty regarding the factual basis for the *Terry* stop.

Thus, we turn to whether the trial court had sufficient "'indicia of reliability to justify'" appellant's stop. *In re S.B.*, 44 A.3d 948, 952 (D.C. 2012) (quoting *Adams v. Williams*, 407 U.S. 143, 147 (1972)) (discussing the importance of reliability of a tipster in a *Terry* stop). As one noted commentator remarked in the context of the related common knowledge doctrine, failing to require a showing of reliability could enable an officer to "bring about a lawful stop by the simple expedient of passing [information] on to another officer." 4 Wayne R. LaFave, *Search and Seizure* § 9.5(j) (5th ed. 2012). But our case law addresses this concern by foreclosing such a result.

As we stated in *In re T.L.L.*, *supra*, to support a finding of reasonable suspicion based on information passed from one police officer to another, the government must apprise the judge "of sufficient facts to enable him to evaluate the nature and reliability of that information." 729 A.2d at 341 (citations omitted). In other words, an officer may rely on a police lookout only to the extent that the lookout itself is based on reasonable suspicion. *Milline*, *supra*, 856 A.2d at 619

(citing *United States v. Hensley*, 469 U.S. 221, 232 (1985)). Applying this requirement, the court in *In re T.L.L.*, *supra*, concluded that the street address where the defendant was arrested could not contribute to a finding of reasonable suspicion, because the government's evidence failed to show what led law enforcement there. 729 A.2d at 341.

In our case, the government did not present the surveillance video purportedly watched by SPO Mason and his colleagues. Nor did the government present a witness who could testify first-hand to the contents of the video. SPO Mason did not testify. And neither did any of the several other SPOs who had huddled around the computer to watch and re-watch surveillance footage. What is more, while we know that the video did not depict the attempted robbery itself, we cannot know where the camera or cameras were located. We thus have no record evidence that would support the conclusion that the video SPO Mason watched had something to do with the attempted robbery — meaning that even if appellant resembled someone in the video, this would not implicate him in the attempted robbery.

On this record then, at best, all we can know is that SPO Mason gave a description to SPO Walker that was — according to SPO Walker's understanding

— based on video footage. This falls short of satisfying the reliability requirement articulated in *In re T.L.L.*, *supra*, and the trial court consequently erred in its legal conclusion.

Moreover, the descriptions given by both the complainant and SPO Mason were too vague in the circumstances to provide reasonable suspicion to stop anyone, given the nature of the neighborhood in question and, especially, the passage of time between the robbery and the stop. For example, as the testimony established and the trial judge acknowledged, "in that neighborhood . . . it's not unique" to see "a black male with blue jeans and a dark jacket" or ski mask. And whereas appellant was apprehended "right in the middle of th[e] [CHV] complex" where the attempted robbery occurred, and "at 12:30 in the morning" when the area could be expected to be relatively less frequented due to a curfew in place at that time, there was a ten-hour gap between the time of the alleged robbery attempt and the stop. This temporal gap undermined any reason to suspect that the assailant was still in the area, and there was no reasonable, articulable suspicion to stop appellant on the basis of either of the descriptions. *See, e.g.*, *In re T.L.L.*, *supra*, 729 A.2d at 341 n.6 (D.C. 1999) (describing 55 minutes as "far too long to support any inference that the robbers . . . would probably still be at or near the scene"); *Cauthen v. United States*, 592 A.2d 1021, 1023-24 (D.C. 1991) (footnote

omitted) (referring to a 15-20 minute gap as "considerably longer than the delay involved in [this court's] past decisions on point").

## IV.

For the foregoing reasons, we reverse the trial court's denial of appellant's motion to suppress.

*Reversed.*