*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 23-CM-0172

COREY D. NELSON-WHITE, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2022-CMD-000461)

(Hon. Gregory E. Jackson, Trial Judge)

(Submitted May 22, 2024          Decided September 26, 2024)

*Michael Madden* for appellant.

*Matthew M. Graves*, United States Attorney for the District of Columbia, with whom *Chrisellen R. Kolb*, *Elizabeth H. Danello*, *Mark S. Levy*, and *Michael C. Lee*, Assistant United States Attorneys, filed a Motion for Summary Affirmance, now treated as a brief, for appellee.

Before BECKWITH, MCLEESE, and DEAHL, *Associate Judges*.

DEAHL, *Associate Judge*: Corey Nelson-White was barred from the premises of Rhode Island Row: a two-building, mixed-use, residential and retail development in Northeast D.C. The staff at Rhode Island Row filled out a barring notice directing

that he "stay off the property and grounds" of Rhode Island Row at "2300/2350 Washington Pl. NE." Officers then let Nelson-White look at the barring notice and explained its contents to him, though they did not provide him with a copy of it. The officers explained that "they don't want you in there" and directed Nelson-White to stay off "the whole 2300 block" of Washington Place. Six days later, Nelson-White was found inside of a parking garage attached to one of the Rhode Island Row buildings. He was arrested and convicted of unlawful entry on the theory that he violated the barring notice.

Nelson-White now appeals, arguing that the evidence was insufficient to prove that he knew or should have known that the parking garage was part of the premises that he was barred from entering. The garage exit (where he was found) did not front Washington Place and did not bear any signage saying that it was part of Rhode Island Row or specifying its address. We agree that the evidence was insufficient to sustain his conviction and therefore reverse.

## I. Facts

We recount the facts in the light most favorable to the government, as that is the relevant lens we view them under when addressing a challenge to the sufficiency of the evidence. *See Rogers v. United States*, 222 A.3d 1046, 1050 (D.C. 2019).

*Background*

Rhode Island Row is a mixed-use development with retail shops like "Smoothie King," "Dunkin' Donuts, Sala Thai, CVS, Chipotle, [and] T-Mobile" on the ground floors, and residential apartments on the upper floors. It consists of two large buildings on opposite sides of Washington Place NE, as depicted below in Figure 1. Each building is a contiguous structure that takes up the entire block on which it sits. Despite their size, there is just one dedicated address per building: 2300 Washington Place to the south, and 2350 Washington Place to the north. A government witness described Washington Place as a "private street," so we take that as true, and it encircles the 2300 building, but not the 2350 building, which is bounded by Rhode Island Avenue to the north and the Rhode Island Avenue-Brentwood Metro station to the west. Here's an aerial map of what it looks like:



**Fig. 1: Map of Rhode Island Row[1]**

Nelson-White was found on the day in question just inside of the garage exit

in the 2350 building, so we have marked that exit above. That exit is tucked around

the "back of the property" and there is no retail signage in its immediate vicinity.

---

[1] A virtually identical map was admitted as Government Exhibit 1, but because that map was marked up by several witnesses to denote a variety of locations not relevant here, and the exhibit itself is harder to embed into this document, we use a cleaned up version that is more reader-friendly.

The exit leads to a small and unnamed side street, not Washington Place itself, which curves past the Metro station and then onto Washington Place, as depicted above. There are signs warning against "loitering" and "trespassing" near the parking garage's exit, but nothing in that area that identifies the garage as part of Rhode Island Row, as 2350 Washington Place, or as bearing any Washington Place address.

*The barring notice and subsequent arrest*

The week before Nelson-White was arrested in this case, he was presented with a barring notice precluding him from being on the premises of Rhode Island Row. He was standing at the "Site of Issuance" marked on the map above, which was directly under a raised Metro platform. What precipitated that barring notice is that on January 19, 2022, Dominique Brown, "a resident concierge" for Rhode Island Row, saw Nelson-White on the premises and knew "he wasn't supposed to be on the property" based on "previous incidents." After calling the police, Brown filled out a form barring notice, which included stock language with several blank spaces (denoted by underlines below), that Brown completed as follows:

> [Corey Nelson-White] was found on the premises owned, occupied, or managed by Bozzuto. This same person is hereby warned to stay off the property and grounds thereof known as Rhode Island Row at (address) 2300/2350 Washington Pl NE and, if applicable, other property owned, occupied, or managed by the same Bozzuto at (address) retailers (suites).

> Reason for Issuing Barring Notice: <u>Harrasment [sic],</u>
> <u>threating [sic] residents and staff with a weapon</u>

There was no further evidence elucidating the last part of the barring notice, i.e., there was no evidence describing the manner in which Nelson-White purportedly harassed and threatened residents and staff.

Officer Erik Moreno and his partner, identified only as "Officer Bardette," responded to Brown's call and took the form barring notice from Brown as she stood in the doorway of the 2300 building's "Leasing Center," marked on the map. The officers then crossed the street where it divides into Washington Place and Brentwood Station, and they approached Nelson-White as he stood under a raised Metro platform.

Officer Bardette explained parts of the barring notice's contents to Nelson-White, and the exchange was captured by body worn camera footage admitted at trial. Officer Bardette told Nelson-White that Brown "don't want you in there," and Nelson-White responded, "I know, copy that." Officer Bardette repeated, "you're barred, okay . . . just don't come back to these two blocks, Washington Place," as he pointed across the street. Officer Moreno explained at trial that when Officer Bardette pointed, he was gesturing at the 2300 block or the street "in the middle" of the buildings. Nelson-White expressed some confusion

about what "Washington Place" meant, and Officer Bardette responded that it meant the "2300 block of Washington Place, you're barred." Officer Bardette told Nelson-White that he could come to the Metro station, but to stay off of Washington Place. Nelson-White looked at the barring notice for several seconds while Officer Bardette held onto it, but he did not receive a copy of the notice itself. Nelson-White said he "accept[ed]" the barring notice, but declined to sign the form, and Officer Bardette explained he was nonetheless allowed to verbally bar him. Officer Bardette then repeated that Nelson-White "can't be on the 2300 block of Washington Place."

Nelson-White was found just inside the exit of the 2350 Washington Place parking garage six days later, on January 25, 2022, and officers arrested him for unlawful entry. He told the arresting officers that he was in the garage because "someone stole my backpack. . . . My brother stole my bag," and he went into the garage to look for it.

*The trial and verdict*

At Nelson-White's bench trial for unlawful entry, the government's opening statement described this as a "straightforward unlawful entry case." In its telling, Nelson-White was barred from Rhode Island Row, and just six days later, he "return[ed] to the 2300 and 2350 block of Washington Place." Nelson-White's

opening statement countered that "2300 and 2350 Washington Place . . . is a rather interesting geographic" area, positing that "it's hard to tell where 2300 and 2350" begin and end. Defense counsel pointed out that Nelson-White was sometimes told he was barred from a single block, and at other times he was told that he was barred from two blocks, but at no point had anybody "made clear to Mr. Nelson-White" that he was "barred from that parking garage." There was "no sign there" on the small side street that Nelson-White traversed leading to the parking garage's exit indicating its address was 2350, or any other Washington Place address, or that it was part of Rhode Island Row.

The evidence most relevant to the government's case is generally recounted above. In addition to Dominique Brown and Officer Moreno, each of whom testified about the January 19th barring order as already detailed, the government also called Officer Damon Lessey (who testified about Nelson-White's January 25th arrest) and Brian Belsky, who worked for Bozzuto and managed Rhode Island Row. Belsky testified that both the 2300 and the 2350 buildings "have a garage associated with" them, and he explained that "when I refer to, like, Rhode Island Row . . . you know, the garage is included in that" and is ultimately under Bozzuto's management. Belsky further explained that the small unnamed side street leading out of the 2350 garage's exit is likewise managed by Bozzuto. On cross-examination, Belsky was asked if there were any signs on the garage exit indicating that it was part of

Washington Place—or "labelling it as 2350 or 2300 Washington Place" in particular—and he acknowledged there were not, but added that there was a "no loitering" sign in that area.

At the close of the government's evidence, the defense moved for a judgment of acquittal, arguing that the "garage over there . . . doesn't have any labels or signs, and there's no way to even tell it's associated with the building," and "nobody said you can't walk around the back side of the building," which does not require traversing Washington Place itself. The trial court denied the motion without expressly addressing what evidence, in its view, supported the notion that Nelson-White knew, or should have known, that the parking garage was part of the premises that he had been barred from.

Nelson-White then testified in his own defense, explaining that he did not know the garage was "the same place" he was barred from. He said he "knew [he] was banned from the 2300 Place," but that "was across the street." He thought the garage was a "separate place[]," and he pointed out that "[t]here's no address posted out" by the garage's exit saying "2350." Nelson-White also testified that he went into the garage to seek warmth—it was cold out that January day—and the government impeached him with his statement at the time of his arrest indicating that he went into the garage to look for a stolen bag. But Nelson-White added

without refute that he also told officers on the scene that he did not know he was barred from the garage, and instead thought he was barred only from the building "across the street."

The trial court found Nelson-White guilty of unlawful entry. It found that Nelson-White was "advised and warned to stay off of the property and told that he should walk around the property as opposed to coming onto the property known as Rhode Island Row if he needed to pass through." And it determined that through Nelson-White's "own testimony, it's clear that he knew [he] had been previously barred from this property."

Nelson-White now appeals his conviction.

## II. Analysis

Nelson-White argues that the evidence was insufficient to establish, beyond a reasonable doubt, that he knew or should have known the garage he entered was part of the "2300 block of Washington Place" or part of "Rhode Island Row," the premises that he had been barred from entering. We review his challenge to the sufficiency of the evidence de novo. *Wiley v. United States*, 264 A.3d 1204, 1209 (D.C. 2021). In doing that, "we 'review the evidence in the light most favorable to the verdict, giving full play to the right of the fact-finder to determine credibility,

weigh the evidence, and draw justifiable inferences of fact.'" *Id.* (quoting *Roberts v. United States*, 216 A.3d 870, 882 (D.C. 2019)). And this court will "deem the proof of guilt sufficient if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc)). At the same time, "it is our obligation to ensure that 'the evidence in a criminal prosecution [is] strong enough that a [trier of fact] behaving rationally really could find it persuasive beyond a reasonable doubt.'" *Wicks v. United States*, 226 A.3d 743, 747 (D.C. 2020) (quoting *Rivas*, 783 A.2d at 134). "[E]vidence that establishes no more than the speculative possibility that the elements are present will not suffice." *Id.* (cleaned up).

"[T]he elements of unlawful entry are (1) the defendant entered onto private property; (2) the physical act of entry was purposeful and voluntary—not accidental or mistaken; (3) the entry was unauthorized, i.e., without lawful authority and against the will of the owner or lawful occupant; and (4) the defendant knew or should have known that his entry was unwanted." *Id.* (cleaned up). The only dispute in this case concerns the fourth element, namely, whether Nelson-White knew or should have known that the parking garage where he was found was part of the premises that he was barred from entering.

We agree with Nelson-White that it is not possible to conclude, beyond a reasonable doubt, that he knew or should have known that the parking garage he entered was part of the premises he was barred from. Viewing the evidence in the light most favorable to the government, Nelson-White was advised not to step foot (1) on Rhode Island Row,[2] (2) on 2300 or 2350 Washington Place, (3) anywhere on the "2300 block of Washington Place," or (4) "these two blocks, Washington Place." But there was no evidence that Nelson-White actually stepped foot on Washington Place itself; the unrebutted evidence was that he traversed a small and unnamed side street leading from the Metro station, where he was allowed to be, to the parking garage's exit. And the government's evidence establishing that the parking garage was in fact a part of Rhode Island Row and the 2350 Washington Place building was not based on anything that a man on the street could readily discern. It was based on the specialized knowledge of Rhode Island Row employees Brown and Belsky.

It is in fact not clear that Officers Moreno and Bardette understood themselves to be barring Nelson-White from entering the parking garage where he was found: (1) the officers did not mention the garage as part of the area that Nelson-White was barred from when issuing the barring notice; (2) in Moreno's testimony, he was

---

[2] In issuing the verbal barring notice, neither Officer Bardette nor Officer Moreno referred to the premises as Rhode Island Row, but that is how the barring notice itself referred to the premises, and Nelson-White got a brief look at that barring notice.

never asked whether the officers understood at the time they issued the barring notice that the garage was part of the barred premises; and (3) the barring notice itself, plus Officer Bardette's instructions that Brown did not want Nelson-White "in there," at least suggested that it was the "retailers" and "suites" that Nelson-White had to stay away from. Plus, from the layout of the buildings, one might just as naturally think the garage had a Rhode Island Avenue address, rather than a Washington Place address. If one were to simply look at Figure 1 above without the addresses marked on the buildings, they would most likely guess that the 2300 block or "two blocks" of Washington Place referred to the two blocks that encircle the 2300 building, perhaps including any stores that front those blocks in the 2350 building. And from where Nelson-White entered the parking garage, it did not appear to check those boxes.[3]

Our conclusion is informed by *Wicks v. United States*, where this court held that the government failed to prove that the defendant should have realized that a barring notice, which prohibited him from entering the Washington Nationals' property and grounds, banned him from standing on a sidewalk outside of Nationals

---

[3] The parking garage did have an entrance off of Washington Place, but that was in no way apparent from the exit where Nelson-White entered it. Also, the 2350 Washington Place building did have a large "Rhode Island Row" sign facing toward the Metro station, but the parking garage had its own quite distinctive façade—it looks from the outside like a separate if possibly contiguous building—without any similar signage.

Park. 226 A.3d at 744-45. We reversed his conviction because Wicks had not been "told, in any form or fashion, that what looked like a public thoroughfare was the private property of the Washington Nationals where he did not have permission to be," *id.* at 745, and we highlighted a number of additional facts that are informative here: (1) there was "no evidence that the Washington Nationals publicly held itself out as the owner of property beyond the stadium structure"; (2) "no evidence in the record about signage, barriers, or other announcements outside the stadium that would have informed a reasonable person that stepping on to the sidewalk would put them on private property"; and (3) "the barring notice [was] not specific as to what property is barred: it g[ave] only a street address for a different street . . . , and it did not append a map showing what property outside of the stadium structure, if any, was covered." *Id.* at 750.

Much like in *Wicks*, there was no indication at the garage exit that it was part of Rhode Island Row or on the 2300 block of Washington Place. There were no signs denoting that the garage was managed by Bozzuto. So "there is no evidence in the record about signage, barriers, or other announcements" at the exit "that would have informed a reasonable person that stepping [in]to the" unmarked garage, off the unnamed pathway, would put them on Bozzuto's property. *Id*. And the barring notice here was unclear in the same way that it was in *Wicks*: It gave "only a street address for a different street . . . and it did not append a map showing what property"

was off-limits. *Id.*; *see also Vaas v. United States*, 852 A.2d 44, 48 (D.C. 2004) (court-issued stay away orders should "set more defined parameters, using maps, if practicable, that can be attached . . . to provide defendants with clear guidance about" what is off-limits). And, as in *Wicks*, the place where Nelson-White received the notice—near the Metro station—was not only different, but largely hidden, from "the location of his arrest." 226 A.3d at 750.

The government counters that Nelson-White ought to have known that the "garage was private property" because there were signs on the garage prohibiting loitering and warning that the property was under surveillance. It is not clear to us why a reasonable person would understand those signs to be indicative of private property, as there are obviously public parking garages (particularly near Metro stations) where we assume the government is free to post similar signs. *Cf. Sheridan Kalorama Hist. Ass'n v. D.C. Bd. of Zoning Adjustment*, 229 A.3d 1246, 1267 (D.C. 2020) ("There is also 'a public parking garage about .2 miles from the Property.'" (quoting Board of Zoning Authority, Decision and Order at 8 (Oct. 30, 2018))); *Washington Metro. Area Transit Auth. v. 6,627 Square Feet of Land*, No. CV 21-1753, 2022 WL 2438549, at *2 (D.D.C. July 5, 2022) (unpublished) ("The 'public purpose' for acquiring the property was 'the construction, operation, use, and maintenance of a replacement [WMATA] garage.'"). But even assuming the premise of the government's argument is correct, and that reasonable people should

know that such signs are indicative of private property, that point is largely immaterial. The relevant question is not whether a person in Nelson-White's shoes would have understood the garage to be private property. It is instead whether he should have known it was a part of the particular premises from which he had been barred.

The government further counters that the "building's entryways were posted with the building's address." That is again of minimal relevance, where there was no evidence that Nelson-White was ever in the vicinity of that signage—he was, after all, barred from the building's entryways—and there was no relevant signage in the area where he entered the garage's exit.

We also do not consider Nelson-White's evolving story about why he entered the garage as meaningful support for the view that he understood the garage was encompassed by the barring order. Recall that at the time of his arrest, Nelson-White said he was looking for a stolen bag, but at the time of trial, he instead testified that he was seeking warmth in the garage. One could view that initial and apparently false story as some consciousness of guilt on Nelson-White's part. *See Bassil v. United States*, 147 A.3d 303, 308 (D.C. 2016) ("[A] false exculpatory statement (or other evasion) permits the finder of fact to 'infer consciousness of guilt.'" (quoting *In re G.H.*, 797 A.2d 679, 684 (D.C. 2002))). But because there are too many other

reasons that Nelson-White would have sought to offer an exculpatory reason for being in the parking garage, not the least of which is that he was arguably trespassing or loitering even if the garage were not covered by the barring notice, this about-face was weak evidence that he was conscious of violating the barring order. *Cf. Headspeth v. United States*, 86 A.3d 559, 567 (D.C. 2014) (existence of reasonable alternative explanations for flight can cause probative value of flight evidence to "largely, if not completely, disappear[]").

To summarize, in order to bar somebody from a wide swath of property it is critical for there to be a clear demarcation as to what premises are off limits. There is little reason to expect anybody outside of Rhode Island Row's employees to know that development's precise metes and bounds. We do not think a reasonable factfinder could rationally find, beyond a reasonable doubt, that Nelson-White knew or should have known that the garage fell within the barred area.

### III. Conclusion

For the foregoing reasons, Nelson-White's unlawful entry conviction is reversed.

*So ordered.*